**Jane DOE, Individually and as Parent and Next Friend of John Doe**

v.

**UNITED STATES of America.**

**Civ. A. No. 86–0179–T.**

United States District Court, D. Rhode Island.

May 9, 1990.

Mercedes Deines, R. Daniel Prentiss, Providence, R.I., for plaintiff.

Everett Sammartino, Asst. U.S. Atty., Providence, R.I., for defendant.

## DECISION AND ORDER

TORRES, District Judge.

This is a negligence action brought pursuant to the Federal Tort Claims Act, Title 28 U.S.C. § 2671 *et seq.* The principal plaintiff is a 12 year old boy who has contracted Acquired Immune Deficiency Syndrome (AIDS) through a series of blood transfusions following a tonsillectomy. His mother is also a named plaintiff both in her capacity as parent and next friend and as the person responsible for her son's medical expenses. The issues presented are whether the defendant's negligence was a proximate cause of the plaintiff's disease, and if so, how damages should be calculated.

## I. FACTS

On April 21, 1983 the plaintiff, who was then five years old, underwent a tonsillectomy at the Newport Naval Hospital. The tonsillectomy was performed by Dr. Richard Busch, a navy surgeon. At the conclusion of the surgery, Dr. Busch placed stitches at the inferior poles of both tonsils even though he acknowledged that the normal postoperative bleeding had been well controlled by suction cautery. He explained the use of sutures as a precautionary measure designed to prevent future bleeding, but one that he subsequently abandoned after reading that the practice created a risk of impaling the nearby tonsillar branch of the lingual artery and that sutures had a tendency to mask such damage by preventing bleeding until they eventually dissolved. Dr. Busch's recollection is that he used 3–0 chromic material, which is relatively fine, eventually dissolves, and is customarily prethreaded on an atraumatic round needle designed to minimize tissue damage. However, both the operative notes that he dictated and signed shortly after the surgery and a report that he prepared several months later pursuant to an investigation conducted by the Office of the Judge Advocate General (JAG report) described the suture material as 0 chromic, which is wider in diameter and makes a larger hole when entering and leaving the tissue.

In any event, the plaintiff was discharged on the day following his surgery. Four days later (i.e. on April 26), he returned to the emergency room after vomiting what his mother described as significant amounts of blood and blood clots. Dr.

Busch elected to stop the bleeding by utilizing a procedure known as electrocauterization which involves searing the tissue by touching it with the tip of a metal probe through which an electric current is passed. Before performing the electrocauterization, Dr. Busch administered a local anesthetic rather than general anesthesia because of his concern that any blood contained in John's stomach might be regurgitated. Consequently, the plaintiff was fully conscious during the procedure and screamed and resisted to the point that he had to be physically restrained by a corpsman and several nurses. Matters were further complicated by the fact that the plaintiff was bleeding profusely thereby obscuring the exact location from which the blood was emanating.

After the electrocauterization stanched the bleeding, the plaintiff was given his first transfusion which consisted of one-half unit of blood (i.e. 125 cubic centimeters). He was then admitted to the hospital where he suffered another episode of bleeding a few hours later. This time he was taken to the operating room. The nature of the bleeding led Dr. Busch to consider the possibility of tying off the arterial vessels supplying blood to the area in question, a procedure which is known as a carotid artery ligation. Instead, he stopped the bleeding through the application of additional sutures. Once again, his recollection is that 3–0 chromic material was used, but the operative report and the JAG report describe it as 0 chromic. There is also a discrepancy regarding the number of sutures used. Initially, Dr. Busch testified that he placed only two sutures, but when confronted with his operative report which referred to multiple oversewing, he conceded that more were required. There is no question that the sutures were applied in a mattress configuration which creates both an entry and an exit hole for each suture rather than in a figure eight configuration which requires only one hole per suture. Nor is there any question that the plaintiff received two units of blood while he was in the operating room and two additional units later that night.

The plaintiff remained in the hospital for approximately one week without further incident and was discharged on the morning of May 4. That evening, he suffered the most severe episode of bleeding up to that time. His mother graphically described seeing blood spurting out of her son's mouth and "running like a faucet." When the plaintiff arrived at the hospital, Dr. Busch advised the plaintiff's mother that a carotid ligation might be necessary. She responded by expressing a total lack of confidence in him and insisting that he do only what was necessary to control the bleeding until her son could be transferred to another hospital. Consequently, Dr. Busch sutured the area again, this time using silk material which is nonsoluble but causes some tearing of the tissue. Two more units of blood were administered during the evening of May 4 and the morning of May 5, increasing to seven the total number of units received at Newport Naval Hospital.

On May 5, the plaintiff was transferred to Boston Children's Hospital where he was attended by Dr. Ellen Friedman, a pediatric otolaryngologist. Dr. Friedman observed extensive tissue necrosis in an area extending well beyond the tonsillar fossa. She then suctioned away the old blood clots to inspect the area. When she did so, the plaintiff began bleeding profusely. The amount of his immediate blood loss was estimated at approximately 600 cubic centimeters which represented somewhere between one-third and one-half of his total blood volume. Under the circumstances, Dr. Friedman was unable to identify the particular vessel from which the blood was flowing. Therefore, she began ligating all arteries in the area. It was not until she reached the lingual artery supplying the vessels at the base of the tongue that she succeeded in stopping the bleeding. The carotid artery ligation performed by Dr. Friedman took approximately seven hours, which is significantly longer than the norm for similar surgery performed under less urgent circumstances. During that procedure and his postoperative recovery, the plaintiff received 47 units of blood.

The plaintiff remained at Children's Hospital for approximately one month after his surgery. At the beginning of that period, he was unconscious for much of the time and was unable to breathe without the assistance of a respirator which was connected to a tube inserted through an incision in his throat. Another tube was inserted in his stomach to facilitate intravenous feeding. As his condition improved, he embarked on a program of physical therapy which was particularly arduous because he had lost considerable muscle strength.

Upon his discharge, the plaintiff returned home. It took him approximately one year to regain the weight lost subsequent to his tonsillectomy. Moreover, he began displaying an increased susceptibility to a variety of abscesses and ear and throat infections some of which required brief periods of hospitalization. By 1986 the plaintiff had apparently stopped growing. At that time, his mother began hearing media reports associating some of those symptoms with AIDS and raising the possibility that the disease could be contracted through blood transfusions. Consequently, she sought further medical attention for her son.

Blood tests performed in April of 1987 disclosed that the plaintiff was infected with the Human Immuno Deficiency Virus (HIV), a precursor to AIDS. Since that time, his condition has tragically deteriorated. He has developed chronic diarrhea and been hospitalized several times for treatment of a number of opportunistic infections that do not afflict persons with normal immune systems. The most serious of those was pneumocystis, a progressive and often fatal form of pneumonia. In addition, he has undergone surgery to implant a tube in his chest so that blood may be drawn or antibiotics administered without the use of a needle. In 1988, the plaintiff began taking an experimental drug known as azidothymidine (AZT) pursuant to a pilot program operated under the aegis of the National Institutes of Health. Initially, the plaintiff responded well to that protocol. However, in March of 1989 he was diagnosed as having developed AIDS, and the uncontradicted medical evidence is that there is an 80% to 90% likelihood that he will die within two years.

## II. PROCEDURAL HISTORY

With the agreement of the parties, this case was bifurcated. The first phase of the trial dealt with whether Dr. Busch was negligent in his treatment of the plaintiff. After hearing the evidence bearing on that question, this Court rendered a bench decision in which it found that Dr. Busch was negligent in dealing with the plaintiff's episodes of postoperative bleeding. That decision was based primarily on the testimony of Dr. Friedman. She attributed the severity of the plaintiff's bleeding to the extensive amount of necrotic or dead tissue that had separated from the surrounding tissue thereby destroying existing clots and damaging nearby blood vessels. She stated that such necrosis was, in turn, the cumulative result of the repeated suturing and cauterization done by Dr. Busch, which she described as inconsistent with applicable standards of medical care. Specifically, she cited the application of sutures immediately after the tonsillectomy even though the bleeding had already been controlled; the use of 0 chromic material which made unnecessarily large holes in the tissue; the apparent depth at which sutures were placed on April 26; the application of sutures in a mattress configuration rather than a figure eight configuration thereby doubling the number of holes made in the tissue; the electrocauterization performed on April 26 under conditions making it difficult to confine tissue damage to the site of the bleeding; the failure to perform a carotid artery ligation on April 26 before further tissue necrosis developed; and the use of highly tissue reactive silk sutures on May 4.

Having determined that Dr. Busch was negligent, the Court proceeded to the second phase of trial which focused on whether that negligence proximately caused the plaintiff's current condition and, if so, what damages the plaintiffs have sustained. Those are the issues that are the subject of this decision.

## III.  PROXIMATE CAUSE

In order to prevail in a medical malpractice action, one of the elements that a plaintiff must prove is that the injuries at issue were proximately caused by the defendant's negligence.  The burden is on the plaintiff to establish such a link by a fair preponderance of the evidence.  *Schenck v. Roger Williams General Hospital,* 119 R.I. 510, 517, 382 A.2d 514, 516–17 (1977).

Determining the presence or absence of proximate cause is a two-step process.  The first step requires an inquiry as to whether the negligent act was a cause "in fact" of the injury.  Unless the defendant's negligence was a contributing factor in producing the harm, this element of causation is lacking and liability cannot be imposed.  *See id.; Gercey v. United States,* 409 F.Supp. 946, 954 (D.R.I.), *aff'd,* 540 F.2d 536 (1st Cir.1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977).  Once causation in fact is established, one must proceed to the second step of the analysis which deals with what is sometimes referred to as legal cause.  It focuses on whether the negligent act is sufficiently related to the injury and of such a nature that the defendant should be held responsible.  This is primarily a question of law that turns on a policy determination regarding the circumstances under which liability should be imposed.  As such, it sometimes becomes enmeshed with the concept of duty because both are often measured by the foreseeability of the injury.  In most instances this element of proximate cause has little to do with the factual aspects of causation.  Rather, it serves to limit what might otherwise be unbounded liability for all of the consequences of one's conduct.  *See* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* §§ 41–42 (5th ed. 1984).

Whether an act of negligence constitutes a cause in fact of a particular injury is commonly determined through application of a "but for" test.  Satisfying that test requires a showing that the injury would not have occurred in the absence of the negligent act.  *Evans v. Liguori,* 118 R.I. 389, 395–96, 374 A.2d 774, 777 (1977).  Whether the negligent act is also viewed as a proximate cause of the injury generally depends upon whether the injury was a reasonably foreseeable or natural and probable consequence of that act.  *See Hueston v. Narragansett Tennis Club, Inc.,* 502 A.2d 827, 830 (R.I.1986).

### A.   *Causation in Fact*

■   In this case, the evidence establishes that the actions of Dr. Busch significantly increased the amount of blood that had to be administered to the plaintiff during the course of his treatment.  Dr. Friedman testified that a carotid artery ligation should have been performed on April 26.  She stated that the one week delay allowed an infection to develop and destroy much of the surrounding tissue.  She also stated that the necrotic condition was exacerbated by the additional suturing and cauterizations performed by Dr. Busch after April 26 which caused additional tissue damage and further infection.  Furthermore, she noted that the bleeding episodes after April 26 greatly reduced the plaintiff's hematocrit, thereby requiring additional blood just to restore it to an acceptable level.  Dr. Friedman was unable to precisely quantify the additional amounts of blood required as a result of those two factors.  She did say that carotid artery ligations were normally relatively bloodless procedures.  That was corroborated by Dr. Sherwin Kevy, the Director of Transfusion Services at Children's Hospital who stated that when such ligations are performed under non-emergency conditions (i.e. where there is no widespread tissue damage or rupturing of blood vessels), they rarely require more than two units of blood.  Therefore, it seems clear that "but for" the delay and the actions of Dr. Busch after April 26, the plaintiff would have required no more than 2 units of blood rather than the 54 units that he actually received.

The government contends that the plaintiff's failure to prove that the HIV virus was not transmitted by one of the first two units of blood administered is fatal to his case.  It argues that since a carotid ligation requiring two units of blood would

have been necessary in any event, Dr. Busch's negligence cannot be viewed as a cause of the infection absent a showing that neither of the first two units administered were tainted. That argument misapprehends the nature of the plaintiff's burden in proving causation in fact.

To prove that the defendant's negligence actually caused his condition, the plaintiff need not conclusively negate all other possible causes. *Hill v. State*, 121 R.I. 353, 356, 398 A.2d 1130, 1132 (1979). The plaintiff need only establish by a fair preponderance of the evidence that it is reasonably probable that his condition resulted from that negligence. *Schenck*, 382 A.2d at 518. In this case, the plaintiff has sustained that burden. First, there is a real question as to whether the plaintiff would have required *any* blood if the treatment he received had comported with prevailing standards. Dr. Loring Pratt, the government's own expert, testified that less than 1% of all tonsillectomy patients require blood replacement. This plaintiff did not receive his first unit of blood until after Dr. Busch had applied the initial postoperative sutures and had later attempted to stop the first bleeding episode by further cauterization. Therefore, there is a distinct possibility that but for those actions, no transfusions would have been necessary. Moreover, if one assumes that a carotid ligation was inevitable, it is far from clear that any blood would have been required if it had been performed in a timely fashion. Dr. Friedman and Dr. Pratt agreed that when the procedure is performed under nonemergency conditions, there is no blood replacement in many cases.

Even if proper treatment would have resulted in the transfusion of some blood, the statistical evidence demonstrates that the HIV infection most likely came from the additional units that had to be administered because of the defendant's negligence. As previously noted, a carotid ligation performed under normal conditions often requires no blood and rarely requires more than two units. In this case, the facts strongly suggest that the virus was not transmitted by any of the first seven units the plaintiff received. All of those units

were administered at the Newport Naval Hospital. Subsequent testing of the donors proved that, with the possible exception of the first unit which was received on April 27 and the sixth unit received on May 4, all were untainted. The status of the other two units cannot be definitively established because the donors could not be located. However, both of those units consisted of packed red cells which is one category of what is generically referred to as a fresh blood product. The evidence shows that hospitals and collection facilities do not store blood in that form for more than 35 days. Therefore, those units must have been donated after March 23, 1983. That date is significant because, effective March 1, 1983, the federal Food and Drug Administration (FDA) required all blood collection facilities to screen potential donors for risk factors associated with AIDS. Since that process apparently depended upon the truthfulness of the donor's responses to a series of questions, it is probably not infallible. However, it greatly diminishes the likelihood that either of the two units in question was infected.

The conclusion that the HIV virus was not transmitted by any of those first seven units is supported by the fact that 24 of the 47 units of blood administered at Children's Hospital were frozen blood products. Since frozen blood products can be stored for up to one year, many of those 24 units could have been and probably were donated before the FDA screening requirements became effective. Consequently, it is likely that one or more of them contained the virus.

That conclusion is also consistent with the results of later efforts to trace the units the plaintiff received and to rescreen the donors. Such a process is referred to as a "lookback" and includes both questioning the donors and subjecting their blood to an AIDS antibody test. The blood administered at Children's Hospital came from two sources. Twelve units of whole blood and 16 units of frozen blood were supplied by the Red Cross. The remaining 11 units of whole blood and eight units of frozen blood had been collected by the hospital. During

the lookback, 16 of the 28 Red Cross donors and seven of the 19 Children's Hospital donors were located and all tested negative for HIV. Unfortunately, the evidence does not indicate whether those donors were the sources of fresh blood products or frozen blood products. Thus, it is possible that the 16 Red Cross donors who were retested could have contributed as many as all 16 or as few as four of the frozen units received from that source. Similarly, it is possible that the seven Children's Hospital donors who were retested might account for none or up to seven of the eight units of frozen blood taken from the hospital's supply. However, statistical probabilities suggest that the actual number of frozen units "cleared" by the retesting process falls somewhere in the middle of those ranges which would leave approximately ten frozen units "uncleared."[1] Even if one assumes the unlikely possibility that all 16 of the Red Cross frozen units and seven of the Children's Hospital eight units came from retested donors, one unit of frozen blood would still remain "uncleared."

In short, all of the fresh blood received at both Newport Naval Hospital and Children's Hospital was subject to FDA mandated screening and/or lookback testing thereby making it unlikely that any of those units were tainted. On the other hand, the donors of at least one unit, possibly as many as 24 units and probably somewhere in the vicinity of ten units of frozen blood were almost certainly neither rescreened nor tested. Consequently, under any scenario, it is much more probable than not that the HIV virus came from one of the units of frozen blood product administered at Children's Hospital rather than from any of the seven units of fresh blood product received at the Newport Naval Hospital. Since those additional units would not have been necessary "but for"

the defendant's negligence, causation in fact has been established.

B. *Foreseeability*

■ As previously stated, causation in fact is necessary but not sufficient to establish proximate cause. In order to prove proximate cause, a plaintiff must demonstrate that the injury claimed was a direct or foreseeable result of the defendant's negligence. Under Rhode Island law, this requirement is satisfied if the injury is a "natural and probable" consequence of the negligent act. *Hueston*, 502 A.2d at 830. It is not necessary that the tort-feasor foresee the precise nature of the injury. All that is required is a showing that *an* injury was reasonably foreseeable.[2] *Id.*

In this case, the government argues that the foreseeability requirement has not been satisfied because the HIV virus was not identified as the cause of AIDS until 1984 and tests to detect the presence of that virus in blood were not licensed for use until April 1985. That argument misses the mark for two reasons. First, the uncontradicted testimony of Dr. Kenneth McIntosh, the Chief of the Division of Infectious Diseases at Children's Hospital, establishes that by the end of 1982 blood transfusions were generally recognized as a possible mode of transmitting the disease even though the exact method of transmission was still unknown. That statement is confirmed by the fact that, effective March 1, 1983, the FDA began requiring that all prospective blood donors be screened for AIDS risk factors. Consequently, at the time the plaintiff underwent his tonsillectomy, blood transfusions presented a clearly foreseeable risk that the patient could contract AIDS. Indeed, Dr. Kevy testified that beginning in 1983 he started warning his patients of that risk.

1. The midpoints of the two ranges are ten and four respectively. When added, they yield a total of 14 persons who were retested and were likely to have contributed frozen blood products. Since 24 units of frozen blood were used, the status of the remaining ten donors is unknown.

2. It is not clear whether the actual injury must be similar in nature to the type of injury that was foreseeable. However, as discussed *infra*, that issue need not be addressed in this case because, in April of 1983, transmission of AIDS as well as other fatal blood borne diseases were known risks of transfusions.

The second flaw in the defendant's argument is that the risk of other serious blood borne diseases was well known long before 1983. Dr. Kevy, Dr. Pratt, and Dr. Friedman all agreed that, by then, it had been generally recognized for many years that transfusions could transmit diseases such as hepatitis and malaria which were sometimes fatal. Consequently, even if the specific risk of AIDS was not reasonably foreseeable, the possibility that transfusions could communicate other life threatening diseases was.

■ The government also contends that the transfusion of contaminated blood was an independent intervening cause that relieves it from liability for the negligence of its agent. The fallacy in that contention is that, under Rhode Island law, a subsequent event cannot be an independent intervening cause if it was reasonably foreseeable. *Walsh v. Israel Couture Post, No. 2274 V.F.W.*, 542 A.2d 1094, 1097 (R.I.1988). Liability is imposed even if the intervening cause involves negligence by a third party, as long as it was reasonably foreseeable. *Testa v. Winquist*, 451 F.Supp. 388, 392 (D.R.I.1978). In this case, there is no evidence that Children's Hospital was negligent. Furthermore, as already noted, it was well known that transfusions could infect the recipient with AIDS or another fatal blood borne disease. Consequently, such an infection was a readily foreseeable consequence of the defendant's negligence and cannot be an independent intervening cause.

## IV. DAMAGES

Generally speaking, the measure of damages to which a successful plaintiff is entitled is that amount that will compensate for the injuries sustained and, to the extent possible, restore the plaintiff to the position previously occupied. *Hill v. Union Railway Co.*, 25 R.I. 565, 566, 57 A. 374 (1904). Under Rhode Island law, a tort plaintiff may recover for all damages that are "the natural and probable consequences of the wrong committed." *Main Realty Co. v. Blackstone Valley Gas & Electric Co.*, 59 R.I. 29, 50, 193 A. 879 (1937). Damages must be supported by legally competent evidence establishing the nature and the extent of the loss claimed. An award cannot be grounded upon conjecture, speculation, or mere possibilities. *Alterio v. Biltmore Construction Corp.*, 119 R.I. 307, 314, 377 A.2d 237, 240–41 (1977); *Pescatore v. MacIntosh*, 113 R.I. 139, 149, 319 A.2d 21, 27 (1974). Nor may it be based on sympathy or emotion. *Godfrey v. United Electric Railways Co.*, 70 R.I. 244, 249, 38 A.2d 308, 311 (1944). Although mathematical exactitude is not required, estimates of damages that are not precisely quantifiable must be substantiated by both reason and probability. *Taft v. Cerwonka*, 433 A.2d 215, 220 (R.I.1981). With these principles in mind the Court will proceed to examine each of the elements of damages claimed by the plaintiff in this case.

### A. Medical Expenses

■ Rhode Island law provides that, in a medical malpractice action, the damages recoverable by an injured plaintiff should be reduced to the extent that compensation has been received from collateral sources. R.I.Gen.Laws § 9–19–34 (current version at § 9–19–34.1 (1986)). In this case, the parties have stipulated that all but $63,897 of the medical expenses incurred to date have been paid by insurance and other sources. Apparently, there is no such coverage for anticipated future medical expenses but the amounts likely to be incurred do not appear to be seriously disputed. Dr. McIntosh gave a reasonably detailed description of the medical treatment the plaintiff will be likely to require during the balance of his two year life expectancy, and a health economist retained by the plaintiff estimated the present value of the cost of that treatment. Based on that testimony, the Court finds the present value of the amount likely to be incurred for plaintiff's future care and treatment to be $182,332.

### B. Lost Earning Capacity

■ In a personal injury action, the measure of damages for lost earning capacity is the difference between what the plaintiff would have been capable of earning if not

injured and what the plaintiff is likely to be able to earn after sustaining the injury. *See Markham v. Cross Transportation, Inc.*, 119 R.I. 213, 221–23, 376 A.2d 1359, 1363–64 (1977); *D'Andrea v. Sears, Roebuck & Co.*, 109 R.I. 479, 488–89, 287 A.2d 629, 634 (1972). In this case, the plaintiff is not expected to survive to employment age. Therefore, his loss of earning capacity is total and must be measured over the entire period of his work life expectancy. However, there are several threshold questions that must be addressed before that computation can be made.

### 1. Work Life Expectancy

The first question is whether the applicable work life expectancy is that of someone in the plaintiff's present condition or that of a healthy person of the same age. The Rhode Island Supreme Court has not yet addressed this precise question. However, this Court has no difficulty in concluding that Rhode Island would take the latter tack. Using a postinjury rather than a preinjury work life expectancy to calculate lost earning capacity would violate fundamental principles of the law governing damages and would produce an absurd and unjust result. As previously noted, the measure of damages for lost earning capacity is the amount by which the plaintiff's ability to generate earnings has been diminished as a result of the defendant's negligence. It should make no difference whether that diminution takes the form of a reduction in the salary the plaintiff is able to command or a decrease in the number of years the plaintiff is able to work. In either case the net result is that the ability to generate earnings is lessened because of the defendant's negligence. Depriving a plaintiff of the right to recover for that portion of his loss attributable to a shortened work life expectancy would frustrate the objective of making the plaintiff whole. Moreover, it would permit the tortfeasor to benefit from the consequences of his own wrongful act at the expense of the innocent victim. Such a result would be inconsistent with both law and logic. Indeed, the weight of authority is that loss of earning capacity should be measured over the course of the work life expectancy the plaintiff would have had if no injury had been sustained. *See, e.g., Sea–Land Services, Inc. v. Gaudet*, 414 U.S. 573, 594, 94 S.Ct. 806, 819, 39 L.Ed.2d 9 (1974); Restatement (Second) of Torts § 924, comments d, e (1977).

The rationale for utilizing a preinjury work life expectancy is especially compelling when recovery would bar any subsequent claim for lost earning capacity in a wrongful death action. That was precisely the situation presented in *Rummo v. Celotex Corp.*, 726 F.Supp. 426 (E.D.N.Y.1989). In that case, the plaintiff sought damages for wrongful exposure to asbestos which had caused him to contract a cancer known as mesothelioma. At the time suit was brought, the plaintiff's demise was imminent. In computing damages for lost earning capacity, the court used the plaintiff's preinjury work life expectancy. In so doing, it noted that, under New York law, any judgment obtained by the plaintiff would bar a later wrongful death action. Accordingly, it concluded that any other method of computing work life expectancy would deprive the plaintiff of the full compensation to which he was entitled. The *Rummo* court also observed that in those states where future lost earnings are calculated on the basis of postinjury life expectancy, judgments in personal injury cases do not foreclose later wrongful death actions.

Like New York, Rhode Island treats a judgment in a personal injury suit as a bar to a subsequent wrongful death action. *Hall v. Knudsen*, 535 A.2d 772 (R.I.1988). Therefore, if the instant plaintiff is not entitled to recover for the full measure of his lost earning capacity, that aspect of his damages will go forever uncompensated, and the defendant will have benefited from the fact that its wrongful acts shortened the plaintiff's life. In effect, the plaintiff would be confronted with the Hobson's choice of forfeiting any claim to lost earning capacity or forfeiting the right to bring suit now for the other damages sustained. Such a result would be inconsistent with fairness and common sense. Accordingly, this Court holds that the plaintiff is entitled

to recover for lost earning capacity over the period of the work life expectancy he would have had if he had not contracted AIDS.

### 2. Deduction of Personal Maintenance Expenses

The second threshold issue that must be addressed is whether the plaintiff's projected loss of future earning capacity should be reduced by the personal living expenses he could be expected to incur during the period of his employment. The general rule is that an injured plaintiff is entitled to the full amount of any lost earning capacity *unreduced* by personal living expenses. *See, e.g., Reilly v. United States,* 665 F.Supp. 976, 995–97 (D.R.I.1987), *aff'd in part, rev'd in part on other grounds,* 863 F.2d 149 (1st Cir.1988); *Burke v. United States,* 605 F.Supp. 981, 989–90 (D.Md. 1985); Restatement (Second) of Torts § 924, comment d (1977). However, the government contends that the rule should not be applied in this case because the plaintiff is not expected to live to incur such expenses. Accordingly, the government argues that this case is more analogous to a wrongful death action in which deductions are made for the living expenses a decedent would have incurred. *See* R.I.Gen.Laws § 10–7–1.1.

Since there is very little authority on this point, the Court begins its analysis by examining the reasons underlying the two different measures of damages. It is evident that living expenses are not customarily deducted in personal injury suits because the injured plaintiff will continue to incur such expenses during his work life expectancy and will be required to pay them from the proceeds of any award for lost earning capacity. Consequently, the policy of not deducting living expenses puts the plaintiff in the same economic position he would have occupied had he not been injured. Whether injured or not, the plaintiff will incur living expenses and will be required to pay them either from actual earnings or from the award that replaces them. Therefore, the award should not be reduced by the amount of those expenses.

In the wrongful death context, the situation is far different. By definition, any award for lost earning capacity relates to a period during which the decedent will not be alive and cannot possibly incur any living expenses. Accordingly, the economic loss is calculated by reducing the decedent's prospective earnings by the amount that would have been expended to support the decedent if the decedent had survived. *See McCabe v. Narragansett Electric Lighting Co.,* 26 R.I. 427, 435, 59 A. 112 (1904); Restatement (Second) of Torts § 925, comment b (1977).

Applying these rules produces the same net result in both personal injury and wrongful death cases. The claimant ends up with the difference between what the victim could have earned and the amount that the victim was likely to expend in the process. In this case, that result can be achieved only if the plaintiff's projected personal living expenses are deducted from his gross earning capacity. As callous as it may seem, this plaintiff, like the decedent in a wrongful death case, will not incur any living expenses. Therefore, his net economic loss for diminished earning capacity is the difference between what he could have earned during his work life expectancy and the personal expenses he would have incurred.

That does not mean that this Court advocates deviating from the general rule applicable to personal injury cases whenever there is evidence that a plaintiff's life expectancy may have been decreased. This case presents an unusually compelling argument for deviation because of the overwhelming evidence that the plaintiff will not survive to incur living expenses during his work life expectancy. In this respect, it is far more analogous to *Incollingo v. Ewing,* 444 Pa. 263, *reargument,* 444 Pa. 299, 282 A.2d 206 (1971), cited by the government, than it is to *Burke v. United States,* 605 F.Supp. 981 (D.Md.1985), cited by the plaintiff. In *Incollingo,* the plaintiff died after suit was commenced but before verdict. Therefore, there was no possibility that she would incur future living expenses to offset any recovery. In *Burke* on the other hand, the plaintiff's life expectancy

was shortened but she was expected to live and incur expenses for at least a portion of her work life expectancy. Accordingly, this Court holds only that in the unique circumstances presented by this case, any award for lost earning capacity must be reduced by the living expenses the plaintiff would have incurred in the pursuit of his livelihood.

### 3. The Calculations

In light of the threshold determinations previously made, it is clear that the plaintiff's recovery for lost earning capacity should equal the present value of the difference between what he could have earned over his projected work life expectancy and the personal living expenses he likely would have incurred. However, the evidence as to what that amount should be is unclear and conflicting to say the least. The plaintiff's expert, Dr. Arthur Mead, a professor of economics at the University of Rhode Island, estimated it to be $1,060,330. The defendant's expert, Professor Francis O'Brien, an economics professor at Providence College, estimated it to be $94,665. This astounding difference is attributable in part to modest variations in the average annual wage increases and the discount rates utilized by each expert. However, the bulk of the discrepancy appears to emanate from radically different views regarding the calculation of fringe benefits and personal living expenses and from what appears to be an erroneous premise utilized by Professor Mead in performing his calculations.

Both witnesses purported to start with what they projected to be the average starting salary for a college graduate in the year during which the plaintiff would attain the age of 22 and enter the work force. There was little difference between those figures. Professor Mead assumed an annual income of $42,000 and Professor O'Brien used a figure of $41,000. However, from that point on, their calculations rapidly diverged despite the similarity of their logic. Both used the starting salary as a basis for projecting a future income stream over the plaintiff's anticipated work life expectancy. Ironically, in doing so, the

defendant's expert assumed an average annual wage increase of 6% and a work life expectancy of 43 years, both of which were more favorable to the plaintiff than the figures of 5.3% and 38 years utilized by the plaintiff's expert. While the gross income stream figures are not in evidence, it is clear that they cannot differ significantly and that, to the extent they do differ, Professor O'Brien's figure is probably higher.

Both experts then discounted the future earnings stream to present value to determine what sum would have to be invested today to produce an amount that the plaintiff could begin drawing upon at age 22 in order to replace his projected annual income. In making that calculation, Professor O'Brien used an 8% discount rate because that is the current level of interest paid by 30 year United States Treasury Bonds. Professor Mead, on the other hand, used a figure of 5.5% which he said was more in line with long term historical averages. The lower figure utilized by Professor Mead would certainly result in a present value appreciably higher than that calculated by Professor O'Brien. However, that is at least partially counterbalanced by the fact that Professor Mead used a much shorter work life expectancy and a significantly lower figure for calculating the projected annual increase in future earnings. Unfortunately, the evidence regarding the preliminary computations made by the two experts is insufficient to permit a determination of the precise extent to which those variations account for the difference between their present value figures. Nevertheless, it appears fairly certain that those variations alone could not possibly account for the magnitude of the difference. Professor Mead calculated the present value of the future earnings stream to be $1,570,237, whereas Professor O'Brien came up with a figure of $475,236.

In searching for the source of that discrepancy, the Court notes that Professor O'Brien arrived at his figure through a two-step process. First, he discounted the plaintiff's future income stream to its value as of the year 2000 (i.e. the year the plaintiff would attain the age of 22 and enter

the work force). That amount came to $1,065,972. He then further discounted that figure to its current present value which he calculated to be $475,236. Professor Mead, on the other hand, did his discounting in a single step. While that method is just as valid, his calculation appears to have been based on a faulty premise as revealed by the following portion of his direct examination:

A. ... So, in my projection I'm driving this thing [plaintiff's stream of anticipated future earnings] higher by five point three percent a year. And what that will do is it will give me my year-by-year for thirty-eight years, my future earnings. And as I said, this starts in 1990 *so this projection starts in 1993*.

Q. That's the year that he is—

A. Expected out of college

Q. —age twenty-two?

A. Right.

Tr. of 12/12/89 at 110–111 (emphasis added).

That colloquy indicates that Professor Mead was under the erroneous impression that the plaintiff would attain the age of 22 in 1993 rather than in the year 2000. Therefore, he presumably calculated the present value of a future income stream beginning in 1993 instead of 2000. As a result, his present value figure is considerably overstated because the amount that would now have to be invested in order to produce a sum required in 1993 would necessarily be much greater than the amount required to produce the same sum in the year 2000. Some idea of the magnitude of that difference may be gleaned from Professor O'Brien's calculations. He estimated that $1,065,972 would be needed in the year 2000 to replace the plaintiff's stream of earnings for the 43 ensuing years but that only $475,236 would be required if it was invested today.

Because of the aforesaid overstatement, the Court finds Professor O'Brien's calculation of the present value of the plaintiff's future income stream to be more accurate. However, the analysis does not end there. Both economists included the value of fringe benefits in their projections of future income but they differed markedly as to what benefits should be included and the value of those benefits. Professor O'Brien included pension benefits but excluded health insurance benefits and the value of the employer's contributions to Social Security on the theory that those items were not cash compensation received by the employee. Consequently, the value he allocated to fringe benefits was only 7% of earnings instead of what he conceded would be a significantly higher figure if additional benefits were included. Professor Mead, on the other hand, included all of those items in his calculations.

This Court has no difficulty in finding that the value of medical insurance should be taken into account in calculating an employee's compensation. It is immaterial that such perquisites are not received in the form of cash and are not considered to be taxable income. They confer an immediate, quantifiable economic benefit on the employee and would otherwise have to be purchased by the employee. Therefore, they are as much a part of the employee's earnings as wages or salary. It is much more difficult to determine the extent to which pension benefits, which may take a variety of forms, and/or an employer's contributions to Social Security, which are not received until after retirement, fall into the same category. In this case, the evidence is insufficient to permit that determination to be made with any reasonable degree of accuracy.

The last major source of variation between the figures provided by the two economists seems to stem from differences in the way they calculated personal living expenses. Based upon Department of Labor statistics, Professor O'Brien assumed personal expenses (including taxes) equal to 77% of earnings, which he discounted to present value and then subtracted from the discounted present value of gross future earnings (i.e. $475,236). The net figure of $94,665 represents a difference of $380,571, or an effective decrease of 80%. Professor Mead's calculations were also based on Labor Department and Internal Revenue Service statistics, but it is not clear exactly

how those calculations were made. The evidence shows only that he calculated the present value of projected future living expenses to be $878,740 which is approximately 55% of his estimate of the present value of gross future earnings. Some, but probably not all of the percentage difference may be attributable to the fact that Professor O'Brien used tables applicable to single persons. Professor Mead on the other hand made what the Court finds to be a more statistically reasonable assumption and used tables applicable to married individuals with families whose personal living expenses constitute a smaller portion of their income.

After considering all of these factors, the Court concludes that the starting point for calculating lost earning capacity should be Professor O'Brien's computation that the discounted present value of future gross earnings is $475,236. Since Professor O'Brien understated that amount by failing to include the value of health insurance benefits, it should be increased by 7.5%, which is the value attributed to those benefits by Professor Mead. The resulting gross income figure must then be reduced to reflect projected living expenses. As previously noted, the 80% reduction applied by Professor O'Brien overstates those expenses because it is derived from tables applicable to single individuals. Therefore, the Court concludes that it would be more accurate to use the 55% reduction arrived at by Professor Mead. Taking these adjustments into account, the result is a present value for projected lost earning capacity reduced by personal living expenses in the amount of $229,895.

### C. Personal Injuries and Pain and Suffering

■ The last and most perplexing element of damages in this case is the award to be made for personal injuries and for pain and suffering. It is well settled that a prevailing plaintiff in a personal injury suit is entitled to fair compensation for whatever physical injuries and/or pain and suffering were experienced as a result of the defendant's negligence. *Hayhurst v. LaFlamme*, 441 A.2d 544 (R.I.1982).

There is no precise formula for computing this element of damages. In making an award, the Court must consider the nature, extent, and duration of those injuries and the attendant pain and suffering. It must then make a reasoned judgment as to what constitutes fair and adequate compensation. *See Reilly*, 665 F.Supp at 984–85. Making that judgment requires that a balance be struck between the goal of fairly compensating the plaintiff and the need to ensure that such awards are reasonable, supported by the evidence and as objective as possible. The Court must be careful not to allow its determination to be influenced by the emotion or sympathy one naturally feels for an injured person. *See Godfrey*, 70 R.I. at 249, 38 A.2d at 311.

That is an extremely difficult task in this case. The plaintiff is a young boy who has been deprived of the opportunity to live out most of his life. The Court recognizes that no amount of money could adequately compensate him for that aspect of his loss and acknowledges being deeply touched by the tragedy that has befallen this youngster. However, the Court is also cognizant of the fact that the law does not permit an award of damages based on one's subjective assessment of the value of a human life *per se*. Compensation is provided only for the economic, physical and emotional injuries associated with the loss of life because they are the only damages that the law is even remotely capable of measuring.

Nevertheless, in this case, the diminution of the plaintiff's life and the pain and suffering he has experienced cannot be entirely separated. The principal constituent of his suffering is the mental anguish he experiences in knowing that he has a relatively short time to live. While all of us live with the knowledge of our own mortality, few of us know it to be so imminent or are reminded of it as frequently and as emphatically as the plaintiff. The impact one might expect such a burden to have on a 12 year old boy is confirmed by the testimony of his mother and several child psychiatrists and nurses who are trying to help the plaintiff deal with his emotional concerns. They described the plaintiff as being very

saddened by his condition and extremely apprehensive about the process of dying. They stated that he also exhibits feelings of guilt about the burden placed upon his mother for his care and treatment.

In addition to his mental anguish, the plaintiff has also experienced and will continue to experience considerable physical suffering. Mention has already been made of his surgery and postoperative recovery as well as the chronic diarrhea and infections that have plagued him as his disease has progressed. These afflictions are likely to increase in frequency and intensity as his condition worsens. Furthermore, as previously indicated, he lives with a catheter implanted in his chest which requires daily cleaning and flushing and he is dependent upon a nasal gastric tube for a portion of his nourishment. Finally, the plaintiff bears a very prominent scar on his neck as a result of the carotid artery ligation. Because of the circumstances under which the ligation was performed, the scar is much more visible than one would ordinarily expect. In addition to being very self-conscious about the disfigurement, the plaintiff is fearful that the scar may reveal the fact that he has AIDS, thereby causing him to be ostracized by other children.

Clearly, none of these things can be translated into money damages with any degree of mathematical precision. The only aspect of the plaintiff's pain and suffering that can be quantified is its duration. That period spans the time during which the plaintiff was first hospitalized and the succeeding months of "recuperation." It also includes the four year balance of his life expectancy beginning in April of 1987 when the HIV virus was detected in his blood and he began exhibiting debilitating symptoms. Because pain and suffering is such an amorphous concept and is shaped by an almost infinite number of variables, its measurement necessarily differs from one situation to another. No two cases are identical, and the unique facts of each case must be considered in determining an appropriate award. Nevertheless, some guidance may be obtained by examining awards made by other courts in similar circumstances. In this case, the most analogous fact situation the Court was able to find was that presented in *Snead v. United States,* 595 F.Supp. 658 (D.D.C.1984). There, a woman who had developed terminal cancer due to a misdiagnosis of her condition was awarded $820,000 for approximately five years of suffering that extended to her anticipated death one year after trial. While that amount would have to be adjusted upward to take ensuing inflation into account, an approximately equal downward adjustment would also be required to reflect the slightly longer period involved. That figure appears to be in line with an award of $1 million recently made by Judge Pettine to an infant girl suffering from profound brain damage in a case where the level of awareness was lower than this plaintiff's but the period involved was considerably longer. *Reilly,* 665 F.Supp. at 984–85.

Taking all of these factors into account and attempting to be as objective as a human being can be under the circumstances, I find $800,000 to be a proper measure of the damages to which the plaintiff is legally entitled for past and future pain and suffering.

## V. JUDGMENT AND ORDER

For the foregoing reasons, I hereby order that judgment be entered in favor of Jane Doe in the amount of $246,229 and in favor of John Doe in the amount of $1,029,895. It is hereby further ordered that within 20 days plaintiffs' counsel submit to the Court a proposed order providing for the disbursement of those amounts in a manner that will ensure that adequate medical and other required care will be furnished to the minor plaintiff for the duration of his lifetime.

IT IS SO ORDERED.