[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court are the "Report and Recommendations" of Allan M. Shine (Shine), the receiver (Receiver) for Danis Transportation Company, Inc. (Danis).
 FACTS/TRAVEL
Danis was a Rhode Island trucking corporation that provided interstate transportation services to major consumer durable and non-durable goods manufacturers and retailers. It employed approximately one hundred employees, including truck drivers, office staff, and independent contractor driver-owners. HNY Holding Company, Inc. (HNY) was a Delaware corporation that owned the majority of Danis' outstanding capital stock. Danis' co-chief executive officers (co-CEOs), Craig C. MacKay (MacKay) and Steven C. Bussey (Bussey), acquired Danis through HNY in July 2000.
At issue in this case are a series of loans (Citizens' loans) that Citizens Bank of Rhode Island (Citizens) extended to Danis. The Citizens' loans include: a $1,200,000 term loan issued on July 19, 2000; a $320,000 term loan issued on August 23, 2001; and a $1,000,000 revolving line of credit loan issued on July 19, 2000. MacKay and Bussey personally guaranteed the term loans, and Citizens took security interests in Danis' accounts receivable, inventory, equipment, and fixtures.[1]
In August of 2001, Danis acquired Transcontinental (also known as Danis South), a truck load company operating from a garage in metropolitan New Jersey. During the second half of 2001, Danis attempted to secure additional investments for working capital. The events that transpired on September 11, 2001, as well as the onset of an economic recession, however, significantly impacted the trucking industry, hurting Danis' sales and making it difficult for Danis to secure equity capital.
By mid-January of 2002, Danis expected to receive $200,000 in subordinated financing from First New England Capital (FNEC) for use as working capital. Danis informed Citizens of this fact, and on or after February 27, 2002, Citizens demanded that this subordinated financing be utilized to pay down the debt to Citizens and not be used for working capital. FNEC subsequently withdrew its offer of financing.
Danis and HNY allege that, through words and conduct, they formulated a particular course of dealing with Citizens. Indeed, for a significant period of time, Danis failed to comply with certain financial convenants associated with the Citizens' loans, and Citizens acquiesced in Danis' conduct. For instance, Danis overdrafted its checking accounts, and Citizens neglected to impose fees or charge interest in response. Furthermore, Citizens failed to enforce or apply the borrowing base formula under the revolving line of credit and permitted Danis to treat deposited but uncollected funds as within Danis' line of availability.
Reacting to this situation, on or about March 1, 2002, Citizens removed the loan officer who had been servicing the Citizens' loans from the account, involved its "workout team," and began dishonoring Danis' checks. On or about this same date, Citizens' counsel sent MacKay and Bussey a letter providing notice of default under the loan agreements and documents, triggering "the commencement of any applicable cure period," demanding that Danis and HNY immediately cure the defaults to the extent possible, and reserving Citizens' rights and remedies under the loan documents. March 1, 2002 Letter at 2. The letter further stated that "[e]ffective immediately, there shall be no further advances to Danis or HNY under the Loans" and that "Citizens . . . shall have no obligation to make any advances to Danis or HNY, nor to honor any over-drafts on any of Danis or HNY's accounts." Id.
Going forward, Citizens' practice concerning the authorization of overdrafts, particularly with respect to Danis' payroll, proved inconsistent. At one point, Citizens instructed Danis that it could overdraft to pay payroll. The checks to the independent contractors, however, bounced while the direct payroll costs were apparently met. Citizens' inconsistent practices caused problems with certain key vendors, including fuel vendors and interline connecting carriers that revoked credit terms and began requiring complete or nearly complete payment of Danis' accounts as a prerequisite to providing goods or services.
On March 8, 2002, Citizens demanded, in consideration of its forbearance from the exercise of its default rights and remedies, that HNY and Danis sign a Forbearance Agreement. Specifically, the Forbearance Agreement provided that Citizens would forbear until March 22, 2002 from taking further action with regard to the defaults if certain terms and conditions were met. Forbearance Agreement at 3. As part of the Forbearance Agreement, Citizens demanded a release in its favor.[2]
On or about March 12, 2002, Citizens' counsel sent a letter to Danis' co-CEOs stating, in pertinent part, that:
 "Effective immediately, . . . Citizens . . . will not honor any check or draft written by Danis, where such check or draft exceeds the available funds in Danis' operating account at Citizens.
 . . . Danis' operating account balance and overdraft status is determined by the amount of collected
funds in the operating account — not the amount of deposited funds. Checks which have been deposited in Danis' operating account, but which have not yet cleared are not collected funds, and therefore said funds are not available to be used to honor checks presented to Citizens.
 Demand is hereby made that Danis immediately deposit at Citizens the amount of cash or other good funds necessary to retire the total amount by which Danis' operating account is overdrawn. As indicated . . . Citizens has no obligation to make any further advances to Danis and HNY under the above-referenced loan or any other credit facility."
 March 12, 2002 Letter at 1-2.
On March 15, 2002, Danis and HNY filed in this Court a Verified Complaint against Citizens. See case docketed in the Office of the Clerk of the Providence County Superior Court as Danis Transp. Co. v. CitizensBank, Case No. PB 02-1346.[3] On this same date, Danis and HNY filed a Motion for Temporary Restraining Order in which Danis and HNY urged this Court to restrain Citizens from (1) exercising any of its default rights and remedies under the loan documents, (2) refusing to honor Danis' checks drawn upon deposited but uncollected funds, and (3) for a reasonable time, dishonoring checks drawn on Danis' account, so long as the aggregate of the balance due on the line of credit and the amount of checks drawn on Danis' account did not exceed $1,120,000. On March 20, 2002, the Superior Court (Silverstein, J.) granted the first and second of these requests, but denied the third.
The parties then engaged in extensive discovery, and in June and July of 2002, they appeared before this Court upon Danis and HNY's prayer for a preliminary injunction. On August 27, 2002, the Court (Silverstein, J.) entered an order enjoining and restraining Citizens from, "[u]ntil the final hearing and disposition of this action or until further order of this Court" (1) exercising any of its default rights and remedies under its loan documents and (2) refusing to honor Danis' checks drawn upon deposited but uncollected funds "up to the following maximum aggregate amount of deposited but uncollected funds at any one time: (A) until and including September 21, 2002, $200,000.00; and (B) thereafter until and including October 21, 2002, $100,000.00; and (C) thereafter, zero." Orderdated August 27, 2002 at 1.
On September 24, 2002, Danis and HNY filed a Motion to Supplement the Preliminary Injunction, but this Court denied their motion on October 15, 2002. Thereafter, on November 22, 2002, HNY petitioned Danis into a voluntary receivership proceeding, and this Court entered an order appointing Shine as Danis' temporary receiver. This Court appointed Shine as Danis' permanent receiver on December 12, 2002.
In the Receiver's Petition to Obtain Post-Petition Advances filed on December 16, 2002, the Receiver agreed to "interview relevant witnesses, review all pleadings and court filings and immediately engage a forensic accountant to assist the Receiver in his investigation and evaluation of any and all claims that the Receiver/Danis may have against Citizens. . . ." Receiver's Petition at 3. The Receiver further agreed that
 "[a]t the completion of his investigation, the Receiver will recommend to the Court EITHER (i) pursuit of the claim against Citizens OR (ii) the entry of an order authorizing the Receiver's execution of a release of the claim against Citizens. The Receiver agrees to complete his investigation of the Claim and file a Report detailing his findings and recommendations regarding his pursuit of or a release of the Claim with the Court on or before 2/21/03." Id.
On January 3, 2003, this Court granted the Receiver's Petition to Engage a Consultant, and pursuant to this order, the Receiver engaged Jerome Lefkowitz, C.P.A. (Lefkowitz) as a forensic accountant. Lefkowitz issued a report addressing the following question: "[a]ssuming, arguendo, that Citizens . . . acted precipitously and unreasonably in connection with its banking relationship with Danis between March 1, 2002 and March 20, 2002 . . ., could the Receiver prove, by a preponderance of the evidence, that Citizens' actions caused Danis' demise?" Lefkowitz'sReport at 1. In other words, Lefkowitz was to determine whether "the Receiver could prove, by a preponderance of the evidence, that Danis would have obtained sufficient equity and sufficient refinancing in a timely fashion so as to be able to survive, but for Citizens' actions?"Id. Lefkowitz answered both questions in the negative.[4]
Shine submitted to this Court a Receiver's Report and Recommendations (Receiver's Report) on May 30, 2003. In the Receiver's Report, Shine examined the issues of liability, causation, and equitable subordination. Shine reserved judgment on the issue of liability, noting that the Court had issued two rulings that were indicative of the Receiver's ability to establish Citizens' liability.[5] As to causation, the Receiver concluded, essentially, that Danis and HNY could not prove proximate cause. Finally, Shine, contrary to HNY's suggestion, found no basis upon which to assert an equitable subordination claim against Citizens.
In light of his findings, Shine declined to recommend pursuit of the claim against Citizens and recommended that the Superior Court enter an order authorizing the Receiver's execution of a release of the claim against Citizens. Receiver's Report at 23. Danis and HNY object to the Receiver's Report.
 STANDARD OF REVIEW
As the Rhode Island Supreme Court has yet to articulate the standard of review that a court must apply when evaluating a receiver's recommendations, the law of other jurisdictions proves informative. InHaymond v. Lundy, the United States District Court for the Eastern District of Pennsylvania reviewed a receiver's proposed distribution of partnership assets. C.A. No. 99-5048, 2002 U.S. Dist. LEXIS 15770, at *4-7 (E.D. Pa. August 23, 2002). On account of "the intensive nature of the Receiver's fact finding, and his uniquely suited ability to resolve factual questions," the court reviewed the receiver's findings of fact for clear error. Id. at *9-10. The court applied a de novo standard of review to conclusions of law. Id. at *10. Similarly, where borrowers challenged the district court's approval of a receiver's sale of assets, the court stated that an abuse of discretion standard applies when deciding whether "a receiver's sale is fair in terms and result and serves the best interests of the estate." Fleet Nat'l Bank v. HDEntertainment, 96 F.3d 532, 540 (1st Cir. 1996). The court further noted that "subsidiary findings of fact are reviewed under a clearly erroneous standard and propositions of law are subject to de novo review." Id.
In light of this persuasive authority, this Court will review the Receiver's findings of fact for clear error and his conclusions of law on a de novo basis.
 RECEIVER'S REPORT
I. Causation
Causation is a binary inquiry, comprised of (1) causation in fact or actual causation and (2) proximate, or legal, causation. Peckham v.Continental Casualty Ins. Co., 895 F.2d 830, 836 (1st Cir. 1990); 57A Am. Jur. 2d Negligence § 435. When analyzing causation in fact, courts apply the "but for" or "sine qua non" rule. Gercey v. United States,409 F. Supp. 946, 954 (D.R.I. 1976). This rule provides that "[t]he defendant's conduct is not a cause of the event, if the event would have occurred without it." Id. Stated differently, the "but-for" rule asks whether "the injury [would] have occurred were it not for the actor's conduct." 57A Am. Jur. 2d Negligence § 436. In situations where two or more causes exist, "each of which by itself is sufficient to bring about injury," the court must determine "whether the defendant's conduct was a substantial factor in bringing about the injury." Id. at § 446. See alsoJorgensen v. Massachusetts Port Authority, 905 F.2d 515, 522-523 (1st Cir. 1990) (noting that to prove causation in fact, the plaintiff must establish "that the defendant's negligence was a substantial factor in bringing about the loss").
In addition to causation in fact, a claimant must establish proximate causation. Peckham, 895 F.2d at 836. Proximate cause presents a question of fact. Wortley v. Camplin, 333 F.3d 284, 295 (1st Cir. 2003); Sullivanv. Young Bros. Co., 91 F.3d 242, 252 (1st Cir. 1996); Munroe v.Cheaters Holding Corp., 808 A.2d 645, 646 (R.I. 2002). Proximate cause constitutes "a limitation [that] the law imposes upon the right to recover for the consequences of a negligent act." 57A Am. Jur. 2dNegligence § 415.
To prove proximate cause, a plaintiff must establish "that the injury claimed was a direct or foreseeable result of the defendant's negligence." Doe v. United States, 737 F. Supp. 155, 161 (D.R.I. 1990); Jorgensen, 905 F.2d at 522. Under Rhode Island law, "the injury must constitute "a `natural and probable' consequence of the negligent act." Doe, 737 F. Supp. at 161. In other words, "[l]iability cannot be predicated on a prior and remote cause which merely furnishes the condition or occasion for an injury resulting from an intervening unrelated and efficient cause, even though the injury would not have resulted but for such condition or occasion." Clements v. Tashjoin,92 R.I. 308, 314, 168 A.2d 472, 475 (R.I. 1961).
"[C]ausation is proved by inference." Skaling v. Aetna Ins. Co.,742 A.2d 282, 288 (R.I. 1999). "[P]roof by inference need not exclude every other possible cause, but it must be based on reasonable inferences drawn from the facts in evidence." Id. Notwithstanding the permissibility of inferences, causation "must be established by competent evidence and may not be based on conjecture or speculation." Martinelli v. Hopkins,787 A.2d 1158, 1169 (R.I. 2001); Skaling, 742 A.2d at 288.
Courts have examined proximate causation in a context similar to that here at issue. In Movitz v. First Nat'l Bank of Chicago, 148 F.3d 760, 761 (7th Cir. 1998), for instance, Hashim, a businessman, formed a corporation, Estock, to invest in a building in which he was interested. Estock, in turn, entered into an agreement with First National Bank of Chicago (Bank) whereby the Bank would evaluate, buy, operate, and maintain the building. Id. After the purchase of the building "turned out to be a disaster," and the area office market took a down-turn, Estock sued the Bank. Id. at 762. Testimony at trial revealed that the Bank failed to ascertain the building's structural soundness prior to the purchase and miscalculated the net income that the building would generate. Id. A jury awarded Estock damages. Id. On appeal, however, the United States Court of Appeals for the Seventh Circuit held that while the element of but-for causation was met, proximate causation was not.Id. at 762-63. It stated:
 "The bank had no contractual or other legal duty to build pens that would prevent the Houston real estate market from diving overboard. The care that the bank was contractually required to take in advising Estock with regard to the purchase of the office building was not intended to prophesy or avert market fluctuations but to make sure that the building was a sound purchase under current market conditions." Id. at 763.
The Receiver, in comparing Movitz with the case at bar, stated:
 "Assuming, arguendo, Citizens' wrongdoing, HNY and its shareholders would make Citizens legally responsible for Danis' collapse, in effect, making it an insurer of Danis' need to obtain necessary new equity and debt refinancing. That seems to the Receiver to be an obligation that Judge Posner would be unlikely to impose on Citizens." Receiver's Report at 15.
After reviewing Shine's findings of fact, this Court holds that the Receiver committed no clear error in determining that Citizens' actions did not constitute the proximate cause of Danis' demise.[6]
II. Equitable Subordination
It is well-settled that in order to establish a claim for equitable subordination, a party must prove the following three elements: (1) "[t]he claimants must have engaged in some type of inequitable conduct; (2) [t]he misconduct must have resulted in injury to creditors or conferred an unfair advantage on the claimant and (3) [e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." In re Hyperion Enters., 158 B.R. 555, 560 (D.R.I. 1993).
Inequitable conduct, as required by the first prong of the test for equitable subordination, includes "(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." Id. Where a creditor does not consist of an insider, however, the conduct must be "egregious and severely unfair in relation to other creditors." In re Giorgio,862 F.2d 933, 939 (1st Cir. 1988).
To meet the second prong of the test, "the proponent of equitable subordination need only allege `that general creditors are less likely to collect their debts' as a result of the allegedly inequitable conduct."In re KDI Holdings, Inc., 277 B.R. 493, 509 (Bankr. S.D.N.Y. 1999). Finally, the third element of the equitable subordination test "recognizes that the doctrine is not a mechanism to be used by courts to alter the statutory scheme in an effort to reach a result the court considers more equitable than the distribution scheme provided for in the Bankruptcy Code." In re Sunbeam Corp., 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002). In general, whether a factual situation merits the application of the doctrine of equitable subordination presents a question of law. In re United States Abatement Corp., 39 F.3d 556, 559 (5th Cir. 1994); In re Clark Pipe Supply Co., 893 F.2d 693, 700 (5th Cir. 1990).
Reviewing on a de novo basis, the Receiver's conclusion that grounds for equitable subordination do not here exist, this Court finds that HNY has provided no evidence of conduct that is egregious and severely unfair in relation to other creditors. Accordingly, this Court upholds the Receiver's recommendation, as based on an equitable subordination theory.
III. Uniform Fraudulent Transfer Act
In their objection to the Receiver's Report, Danis and HNY assert that if Lefkowitz's Report is correct, the Receiver possesses a claim under the Uniform Fraudulent Transfer Act. More specifically, Danis and HNY argue that pursuant to R.I.G.L. 1956 § 6-16-4(a)(2), "[t]he Receiver may avoid any transfer or obligation which was incurred by Danis, without receiving a reasonably equivalent value, where Danis was about to engage in a business for which its remaining assets were unreasonably small in relation to the business." Danis and HNY's Objection to Receiver'sReport at 19. Danis and HNY further contend that under R.I.G.L. §6-16-5(a), "[t]he Receiver may avoid any transfer or obligation which was incurred by Danis, without receiving a reasonably equivalent value, where Danis became insolvent as a result of the transfer or obligation." Id.
In support of their assertions, Danis and HNY claim that (1) in the year 2000, Danis incurred $2,200,000 in debt to Citizens as part of the acquisition by HNY; (2) Citizens acquired a security interest in substantially all of Danis' assets as collateral for that debt, as part of a leveraged buy-out; (3) according to Lefkowitz, Danis was insolvent immediately after the transaction closed; and (4) Danis received no reasonably equivalent value in exchange for that debt or security interest as the new debt went to the former shareholder of Danis and to transaction costs.[7]
In reply to Danis and HNY's objection, Citizens argues, inter alia, that according to Lefkowitz's Report, Danis was solvent at the time of the Citizens' loans and that "Danis' failure to make money starting in late 2000 was the beginning of its insolvency." Citizens' Reply at 5.
The Uniform Fraudulent Transfer Act (UFTA) provides that:
 "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
 . . . .
 (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
 (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or. . . ." Section 6-16-4(a)(2).
UFTA further specifies that:
 "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time, or the debtor became insolvent as a result of the transfer or obligation." Section 6-16-5(a).
Moody v. Security Pacific Business Credit, Inc., 127 B.R. 958 (W.D. Pa. 1991), examines a fraudulent conveyance claim in the context of a leveraged buy-out. Moody involved the following factual scenario:
 "[O]n July 31, 1981, Coke and KNY sold Jeannette Corporation for $12.1 million to J. Corp., a holding company controlled by an investor group headed by defendant John P. Brogan. The Brogan group borrowed $11.7 million of the purchase price from defendant Security Pacific Business Credit, Inc. (sometimes hereafter "Security Pacific") through a transaction structured so that the loan ultimately was secured by a lien on all of Jeannette's assets. After some fifteen months under the Brogan group, a creditor of Jeannette filed an involuntary petition in bankruptcy against it under Chapter 7 of the Bankruptcy Code." Id. at 964.
In examining whether the July 31, 1981 transaction had rendered Jeannette insolvent, the United States District Court for the Western District of Pennsylvania noted that "[i]n considering the `present' fair salable value of Jeannette's assets," the court "must value them on a going concern basis, rather than on a liquidation basis." Id. at 995. Relying in part on Jeannette's net worth as evidenced by its balance sheet, the court held that Jeannette was not insolvent in the "bankruptcy sense."Id.
 Credit Managers Assoc. of Southern California v. Federal Co.,629 F. Supp. 175 (C.D. Cal. 1985) also concerned a fraudulent conveyance claim in the context of a leveraged buy-out. In CreditManagers, the United States Bankruptcy Court for the Central District of California considered testimony regarding cash flow in determining whether a transaction had caused the debtor to become insolvent. Id. at 183-84.
Examining the Receiver's conclusions of law on a de novo basis and the Receiver's findings of fact for clear error, this Court upholds the Receiver's Report with regard to a UFTA claim. This Court finds no clear error in the Receiver's factual finding that Danis, as based on its balance sheet net worth and its cash flow, was not insolvent on July 21, 2000, the date HNY acquired Danis. In the absence of a finding of insolvency, Danis and HNY cannot maintain a claim against Citizens under UFTA.
 CONCLUSION
Having found that the Receiver committed no clear error in determining that Citizens' actions did not constitute the proximate cause of Danis' demise or with regard to Danis' insolvency under UFTA, and that an equitable subordination claim is unwarranted, this Court upholds the Receiver's recommendations.
[1] Danis at the inception of this receivership proceeding owed Citizens a total of $2,300,000 in secured debt. In addition to the debt it owed Citizens, Danis owes FNEC approximately $1,100,000, which FNEC provided as a "mezzanine lender" in July of 2000. Danis also owed its former owner a subordinate note valued at about $114,000.
[2] To this effect, the Forbearance Agreement stated:
 "Danis, HNY and the Guarantors hereby release Citizens . . . and its successors and assigns from any and all claims, demands, causes of action, and liabilities of any kind or character whatsoever, known or unknown, in contract or in tort, at law or in equity, which they ever had, now have, or might hereafter have, against Citizens . . ., including, without limitation, all claims for loss or damage in connection with the negotiation and execution of the Loan Documents, the administration of or collection under the Notes pursuant thereto by Citizens . . ., and the negotiation and execution of this Forbearance Agreement caused by any act or omission on the part of Citizens . . ., its officers, attorneys, agents, or employees." Forbearance Agreement at 8-9.
[3] In the Verified Complaint, Danis and HNY asserted claims for breach of contract, breach of implied obligation of good faith and fair dealing, promissory estoppel, equitable estoppel, breach of implied contract, tortious intentional interference with contractual relations, tortious intentional interference with prospective contractual relations, and equitable relief.
[4] In reaching this decision, Lefkowitz noted:
 "On February 28, 2002, Danis was a company that had no equity capital, . . . was continuing to record losses, was in an overadvanced, overdraft position with Citizens, operating in a recessionary environment in a fragmented, highly competitive industry and was insolvent in the `bankruptcy' sense as well as the `equity' sense.
 . . . .
 Citizens' actions of March 1, 2002 and the succeeding weeks did not change the fair value of Danis. We believe that Danis was insolvent on February 28, 2002 and insolvent after March 1, 2002, and that Citizens was under-secured on February 28, 2002, before that date, and after that date.
 . . . .
 . . . Danis, as of February 28, 2002, in fact had no realistic prospects of obtaining the necessary equity and refinancing which were required for it to survive.
 . . . .
 . . . Danis did not survive because it was under capitalized, illiquid and did not operate as a profitable entity." Lefkowitz's Report at 28-30.
[5] Specifically, in granting the temporary restraining order, the Court stated: "The Court . . . is satisfied that there is a likelihood of some success by the plaintiffs here predicated on the bank's actions, primarily with respect to the manner in which the bank permitted the use of the revolving line of credit." March20, 2002 Tr. at 11. Similarly, when granting Danis and HNY's request for a preliminary injunction, the Court stated that "[t]his Court believes that in fact the plaintiffs have made a showing of a reasonable likelihood of succeeding on the merits of their claim. . . ."August 21, 2002 Tr. at 12.
[6] Having made this determination regarding proximate cause, this Court declines to address Danis and HNY's arguments concerning liability.
[7] Danis and HNY rely on the fact that "over 87% of the funds for the July 2000 acquisition of the stock in Danis were used to buy the stock, but only 5% were used to refinance existing debt." Danis and HNY'sPost-Hearing Memo. at 8.