Louis A. MOVITZ, as Trustee, and Estock Corporation, N.V., Plaintiffs–Appellees, Cross–Appellants,

v.

FIRST NATIONAL BANK OF CHICAGO, Defendant–Appellant, Cross–Appellee.

Nos. 97–3761, 97–3818.

United States Court of Appeals, Seventh Circuit.

Argued May 26, 1998.

Decided June 23, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 25, 1998.*

* Hon. Walter J. Cummings and Hon. Ilana Diamond Rovner did not participate in the consideration of the petition.

Jerold S. Solovy, Jenner & Block, Chicago, IL, Peter Flynn (argued), Myron M. Cherry, Cherry & Flynn, Chicago, IL, for Louis A. Movitz in No. 97–3761 and Estock Corporation.

Kathleen M. McCarthy, Winston & Strawn, Chicago, IL, Lynn A. Goldstein, First National Bank of Chicago, Chicago, IL, James D. Dasso, Foley & Lardner, Chicago, IL, Marjorie P. Lindblom (argued), Kirkland & Ellis, New York City, for First National Bank of Chicago in No. 97–3761.

Peter Flynn (argued), Cherry & Flynn, Chicago, Il, for Louis A. Movitz in No. 97–3818.

Jerold S. Solovy, Jenner & Block, Chicago, Il, Peter Flynn, for Estock Corporation in No. 97–3818.

Before POSNER, Chief Judge, and BAUER and COFFEY, Circuit Judges.

POSNER, Chief Judge.

A jury awarded Estock Corporation some $3.3 million in damages in a diversity suit against the First National Bank of Chicago for breach of contract and of fiduciary duty. The bank appeals, and Estock cross-appeals seeking the addition of prejudgment interest to the judgment. The principal ground of appeal, and the only one we shall have to consider, is that Estock failed to prove that the bank's conduct was the "cause" of its loss within the meaning that the law attaches to this term when a plaintiff is seeking an award of damages. The applicable law, the parties agree, is that of Illinois.

Back in 1980, Jawad Hashim, a foreign businessman, told an executive of the First National Bank that he wanted to invest $2 million in U.S. real estate. The bank's real estate acquisition department located an office building in a Houston suburb and took Hashim on a tour of it and he liked it well enough. He created Estock to be the vehicle for his investment in the building, and Estock in turn signed an agreement with the bank under which the bank was to evaluate, buy (for Estock), and operate and maintain the building. Movitz, the other plaintiff, is Hashim's trustee in bankruptcy. His claims were dismissed, and he has appealed the dismissal, but he concedes that the appeal is moot unless we order a new trial; we are not going to do that and so we can ignore him and treat Estock as the sole plaintiff.

The bank bought the building for Estock for $5.1 million, with Estock putting up $2.2 million in cash and assuming a $2.9 million mortgage. The purchase turned out to be a disaster. In April of 1984 Estock transferred the operation of the building to another bank, which could not stem the losses despite Estock's investing another $800,000; in June of the following year the mortgagee foreclosed and Estock's entire investment, minus some trivial earnings ($50,-000), was lost. The jury awarded Estock its total out-of-pocket loss and more, but the more may represent the opportunity cost of the investment—the return that Estock would have received had it invested the money otherwise. Since the purpose of an award of damages is to put the plaintiff in the position that he would have occupied but for the wrongful act of the defendant, there is no objection in principle to awarding a plaintiff not only lost principal but lost profit, though such awards are frequently denied as too speculative. See, e.g., *Doll v. Bernard*, 218 Ill.App.3d 719, 161 Ill.Dec.

407, 578 N.E.2d 1053, 1057 (1991); *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 922–23 (11th Cir.1987). Whether it was too speculative in this case is another issue that we won't have to resolve.

■ We may assume that the agreement implicitly required the bank to exercise due care in the performance of the duties that the agreement imposed on it, *Index Futures Group, Inc. v. Ross*, 199 Ill.App.3d 468, 145 Ill.Dec. 574, 557 N.E.2d 344, 348 (1990); *Outboard Marine Corp. v. Babcock Industries, Inc.*, 106 F.3d 182, 185 (7th Cir.1997); *Spartech Corp. v. Opper*, 890 F.2d 949, 951–52 (7th Cir.1989), and that it failed to do so. According to testimony that a reasonable jury could credit, the bank carelessly failed to check in advance of the purchase the building's structural soundness and as a result failed to discover that the building had not been properly designed to prevent its foundation from settling and that the air conditioning ducts could not deliver enough cool air to keep the tenants comfortable—a serious problem in Houston's climate. A reasonable jury could also find that the bank carelessly miscalculated the net income that the building would generate. Even though it had complete information about the building's rental income in the near term because the building was fully occupied, the bank managed to overestimate the net cash flow in the very first year of Estock's ownership by a factor of almost four ($135,000 versus $35,-000).

In the following year, 1982, the Houston office market began to turn down, yet the bank did not consider selling the building. By the end of 1983, with the market now "terribly ill," the building was more than 30 percent vacant; it was almost 40 percent vacant when the building was turned over to new management a few months later. Although the foundation and air conditioning problems could have been corrected at a total cost of less than $100,000, they had not been (though they were later). As a result there was rising tenant dissatisfaction and even a threat (never carried out, though) of a tenants' strike.

Had the bank been more careful at the outset and discovered then that the building was less profitable than it appeared to be and that it required significant repairs, the deal might never have gone through: the bank might not have recommended the purchase, Hashim might have gotten cold feet, or Estock might have offered the owner of the building a lower price which the owner would not have accepted. So had it not been for the bank's negligence in evaluating the property, Estock might indeed be $3.3 million to the good. Of course, this depends on what it would have done with the money had the deal fallen through. Had it invested it in another office building in Houston, the money might well have been lost, given what happened to the market. But if instead the money had been invested in an office building or other commercial property in an area that did not experience the disastrous downturn that the Houston real estate market experienced in the early 1980s (as a result of overbuilding and a sharp decline in the price of oil that hurt business in the city), probably the money would not have been lost; its investment might even, as we noted earlier, have generated a significant profit. At any rate, there was enough evidence (though only barely, as we shall see later) that the bank's negligence was a "but for" cause of Estock's losing its investment to allow the jury to find that it was.

■ As Estock reluctantly concedes, however, a finding of "but for" causation (what philosophers call a "necessary condition") is not a sufficient basis for imposing legal liability. If it were, then the estates of Santa Anna, Sam Houston, or Columbus might also be liable to Estock, plus the inventor of the elevator or the steel girder, or Hashim's parents, or OPEC, which brought about the increase in oil prices that fueled Houston's real estate boom in the 1970s, a boom that made investing in that real estate seem so attractive a prospect in 1980.

■ The principle that but-for causation is not enough to establish civil liability for carelessness or other wrongdoing is pertinently illustrated by the famous old English case of *Gorris v. Scott*, 9 L.R.-Exchequer 125 (1874). The plaintiff's sheep were being transported on a ship owned by the defendant. A storm

arose and the sheep were swept overboard to a watery death. The defendant had failed to equip the ship with pens for the sheep, as he was required to do in order to prevent the spread of disease among the animals. Had he complied with his duty the sheep would have been saved. And so the violation of the duty was a "but for" cause of their loss. Yet the plaintiff was not allowed to recover any damages. The loss of the sheep was a consequence, but not a foreseeable consequence, of the violation of a legal duty, because the duty was to take precautions against a different kind of loss from the one that materialized. See also *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1258 (7th Cir.1995); *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 708–09 (7th Cir.1984); *Restatement (Second) of Torts* § 281, comments e and f and illustration 3 (1965); Robert E. Keeton, *Legal Cause in the Law of Torts* 3–11 (1963). It is the same here. The bank had no contractual or other legal duty to build pens that would prevent the Houston real estate market from diving overboard. The care that the bank was contractually required to take in advising Estock with regard to the purchase of the office building was not intended to prophesy or avert market fluctuations but to make sure that the building was a sound purchase under current market conditions.

The distinction between "but for" causation and actual legal responsibility for a plaintiff's loss is particularly well developed in securities cases, where it is known as the distinction between "transaction causation" and "loss causation." E.g., *Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 535 (7th Cir. 1998); *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir.1990); *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.1988); *Robbins v. Kroger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997). Suppose that an issuer of common stock misrepresents the qualifications or background of its principals, and if it had been truthful the plaintiff would not have bought any of the stock. The price of the stock then plummets, not because the truth is discovered but because of a collapse of the market for the issuer's product wholly beyond the issuer's control. There is "transac-

tion causation," because the plaintiff would not have bought the stock, and so would not have sustained the loss, had the defendant been truthful, but there is no "loss causation," because the kind of loss that occurred was not the kind that the disclosure requirement that the defendant violated was intended to prevent. To hold the defendant liable for the loss would produce overdeterrence by making him an insurer against conditions outside his control. Of course, one could take a very hard line and argue that the defendant had only himself to blame—had he told the truth he would have no liability. But the law rejects this argument, perhaps believing that it is unrealistic to suppose that potential defendants have such complete control over their actions (realistically, the actions of their employees and other agents) that they won't worry about, and so overprotect against (which is what we mean by overdeterrence), the liability to which they will be subject if through a lapse of diligence they violate the law. Also, it is bad policy to encourage people harmed in some natural or financial disaster to cast about for someone on whom to lay off the consequences who had, however, committed only a technical breach of duty. *Bastian v. Petren Resources Corp., supra*, 892 F.2d at 685; W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 43, p. 282 (5th ed.1984). The legal system is busy enough without shouldering the burden of providing insurance against business risks. Had Hashim diversified his investments, he would not have taken such a big hit when the Houston real estate market collapsed.

■ Estock argues that the distinction between transaction causation and loss causation makes more sense in securities cases than in real estate cases. But that is not the law. The requirement of proving loss causation is a general requirement of tort law. See, e.g., *Spiegel v. Sharp Electronics Corp.*, 125 Ill.App.3d 897, 81 Ill.Dec. 238, 466 N.E.2d 1040, 1044 (1984); *National Credit Union Administration v. Michigan National Bank*, 771 F.2d 154, 157–59 (6th Cir.1985). It is more commonly invoked in cases involving a statutory rather than a common law duty of care, see *Abrahams v. Young &*

*Rubicam Inc.*, 79 F.3d 234, 237–38 and n. 3 (2d Cir.1996); Keeton et al., *supra,* § 43, p. 281, but it is not limited to statutory cases, see *Restatement (Second) of Torts, supra,* § 281, comments e and f, and we cannot think of any reason why it should be. Even the authors of the Prosser treatise, though critical of the rule in general, Keeton et al., *supra,* § 43, pp. 281–82, do not criticize its application in fraud cases, *id.,* § 110, p. 767, to which the present case, involving as it does alleged breach of fiduciary duty and negligent misrepresentation, is kin. And we cannot begin to see why the securities market and the real estate market should be distinguished. The Houston commercial real estate market crashed as surely in the early 1980s as the stock market crashed in 1929 or 1987, and no one supposes that the First National Bank of Chicago had undertaken to insure Estock against such a catastrophe. This case involves breach of contract as well as tort, but we do not understand Estock to be arguing that contract law provides a more generous measure of damages. On the contrary, consequential damages are more difficult to obtain in a breach of contract suit than in a tort suit.

This case is actually weaker for damages than either *Gorris* or our hypothetical securities-fraud case. In *Gorris,* we know, the sheep would have been saved, however adventitiously, had the defendant complied with its statutory duty. In the securities-fraud case, the investor's money would have been saved had he not bought from the defendant, because the change in market conditions that made the price of the stock fall was specific to the defendant's company. The market crash that wiped out Estock's investment was city-wide and could easily have wiped out an alternative investment that Estock would have made in Houston had the deal negotiated by the bank fallen through. Estock does not deny that in 1980 Houston seemed an attractive place in which to invest in commercial real estate.

What is even more likely is that Estock would have bought the same building, only at a lower price, had the bank exercised due care. But this means that Estock's entire investment would still have been lost, albeit that investment would have been smaller. In short, it is far from clear that the $3.3 million that the jury awarded Estock is a loss that would have been averted had the bank been careful (whether or not as a result Estock would have decided not to buy the building), let alone a loss that satisfies the criterion of loss causation. But we shall pass the "but for" issue for the moment and focus on the loss-causation issue.

That issue is whether, had it not been for the bank's carelessness, the building would have retained any of the value that Estock was led to believe that it had at the time of the purchase. Estock concedes that by 1983 the Houston commercial real estate market was in terrible shape. Average vacancy rates were in the high 30s (percent); that too is conceded. By 1985, many office buildings in the Houston area had lost value. Perhaps some of these had structural defects, too; yet it is entirely implausible and unproven that defects which could have been repaired for under $100,000 caused the value of Estock's building to plunge from $5.1 million to $2.8 million (the price at which the mortgagee bought the building at the foreclosure sale). We recognize that for want of a nail a kingdom can be lost. Estock argues that the bank's failure to correct the defects scared tenants away. But the record belies this. The building's vacancy rate was little if any higher than the average vacancy rate for Houston office buildings. Estock argues that the bank had a duty to sell the property in 1982, when it realized that it had overestimated its earnings. But the correction of the overestimate would have depressed the sale price; so a sale, with all the transaction costs entailed thereby, would not—except in hindsight—have benefited Estock. The bank can hardly be faulted, moreover, for failing to foresee in 1982 the collapse of the market that occurred in 1984 and 1985; apparently no one else foresaw it either. Had the collapse been generally foreseen, the building could not have been sold for any more in 1982 than in 1985—who would have bought it for more, knowing what lay ahead?

We are not the finders of fact, but it is our job to determine whether there was enough evidence to warrant a reasonable jury in

finding that, had the bank acted throughout with due care, Estock would not have lost $3.3 million or some other definite amount. There was not. There was no evidence of what the building would have been worth in 1985, when Estock was wiped out by the foreclosure, had the bank exercised due care in acquiring and operating the property. For all that appears, it would not have been worth a cent more than $2.8 million, in which event Estock would have lost its entire investment anyway.

Even so, Estock might have been able to prove an entitlement to some damages. It would have had to put on a witness who would value the property on the date of purchase on the assumption that the net income had been correctly calculated and the structural defects repaired. Suppose the property could have been bought for only $4 million (almost certainly too low, but the precise figure doesn't matter) had the bank done its job. We know that five years later the building was worth $2.8 million. So if Estock had paid only $4 million for the building, it would not have lost $3.3 million when the mortgagee foreclosed; for it would not have had as much to lose if it had paid only $1.1 million ($4 million minus $2.9 million, the amount of the mortgage) rather than $2.2 million for the building. Suppose that on the assumption of a purchase price of $4 million Estock would have lost only $2.3 million in the crash. Then the damages recoverable in this suit would be $1 million—the difference between the loss that Estock would have sustained had the bank acted with due care (enabling Estock to buy the building at a lower price), which we are assuming to be $2.3 million, and the larger loss that actually sustained ($3.3 million).

■ The plaintiff did not take this approach to calculating damages. It did not ask the jury to separate the losses due to the bank's errors from the losses due to the collapse of the commercial real estate market. The jury was correctly instructed on the difference between transaction causation and loss causation, but the plaintiff limited its damages case to the former. The judgment must therefore be reversed with directions to enter judgment for the defendant. Techni-cally, the plaintiff is entitled to a judgment for nominal damages, because it proved a breach of contract, *Hentze v. Unverfehrt*, 237 Ill.App.3d 606, 178 Ill.Dec. 280, 604 N.E.2d 536, 540 (1992); *Hydrite Chemical Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 891 (7th Cir.1995); but for obvious reasons it is not seeking such a judgment.

This result may seem very harsh. It may seem obvious that Estock lost something—at the very least, the $66,000 that it eventually paid to correct the foundation subsidence problem that the bank had overlooked. But it may not have lost this money as a result of the bank's misconduct but only as a result of the collapse of the Houston real estate market. The foreclosure sale fetched only $2.8 million. Suppose that Estock had not bothered to repair the foundation and that as a result the foreclosure sale had fetched only $2.734 million ($2.8 million $66,000). Estock would have been no worse off, because the price at the foreclosure was lower than the unpaid balance of the mortgage—which means that it gained nothing from the expenditure of the $66,000. It was throwing good money after bad. (In contrast, if the unpaid balance of the mortgage had been only $1 million, Estock would have recovered the expenditure in the higher price at the foreclosure sale.) It is possible, even likely, that if the bank had done its work properly, Estock would have gotten the building at a lower price and so would have lost less in the collapse. But remember, it did not attempt to calculate its damages on this basis. It went for the big bucks in this suit now shockingly in its twelfth year. It tried to recover for a loss caused by extraneous economic conditions. It forewent the opportunity to prove a smaller loss but one recoverable under the law of damages, which was not drafted by Santa Claus.

In light of this disposition of the bank's appeal, the cross-appeal (including Movitz's conditional appeal) is moot.

Judgment Reversed, Cross–Appeal Dismissed.