TRIDENT INVESTMENT MANAGE-
MENT, INC., Meyer Investment Prop-
erties, Inc. Public Fund I–1983, and
CAMCO, Inc., Plaintiffs–Appellees,
Cross–Appellants,

and

American National Bank and Trust,
Plaintiff–Intervenor–Appellee,

v.

AMOCO OIL COMPANY, Defendant–
Appellant, Cross–Appellee,

and

Menginder Bhambra, Defendant–
Cross–Appellee.

Nos. 98–1428, 98–1495.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 4, 1998.

Decided Sept. 21, 1999.

Frederic R. Klein (argued), Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Chicago, IL, for plaintiffs–appellees.

Richard C. Godfrey (argued), Kirkland & Ellis, Chicago, IL, Elizabeth M. Budzinski, Wilson, Elser, Moskowitz, Edelman & Dicker, Chicago, IL, for defendants–appellants.

Before BAUER, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

The old common law adage "*caveat emptor*" captured the idea that buyers have a responsibility to watch out for their own interests. While modern consumer protection laws might have softened that duty somewhat, there is one area in which buyers hardly need the reminder. Commercial purchasers of real property are acutely aware that they must learn about and protect themselves against liability for any possible environmental contamination that may taint a parcel of land. The rules imposed by statutes such as the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901–6987, and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9657, make it clear that an incautious buyer would at least be purchasing a lawsuit, and at most be purchasing a potentially enormous clean-up bill, if it fails to address these risks *ex ante*.

This case looks at one aspect of that problem. It concerns the harm that the seller of a parcel that is known to be contaminated suffers when buyers heed the old adage and shun the property until the risk of liability for its clean-up is eliminated. A trust controlled by three pension funds, Trident Investment Management, Inc.–Meyer Investment Properties, Inc. Public Fund I–1983 ("Trident"), owned land on which a shopping center was located. Amoco Oil Company owned a gasoline service station on adjacent land. As we explain in more detail below, Amoco ultimately stipulated that underground storage tanks from its station had contaminated Trident's property and that it (and its lessee) were liable for damages to the plaintiffs under RCRA. A jury awarded Trident and CAMCO $1,850,000, but Amoco now argues that the measure of damages the court instructed the jury to use was erroneous as a matter of law, that the

court erred in certain evidentiary rulings, and that Amoco itself was entitled to judgment as a matter of law because the plaintiffs failed to mitigate their damages. Plaintiffs have cross-appealed the court's decision to dismiss their claim for punitive damages. We conclude that no part of the district court's handling of this complex case constitutes reversible error, and we therefore affirm its judgment.

## I

Trident is an Illinois trust that invests funds in a real estate portfolio. It was organized in 1983 to handle $65 million held by three public pension funds; it was to have a 10-year life, at the end of which it would sell off its assets and return the proceeds to the pension funds. CAMCO, Inc., was the property manager for Trident. One of the properties Trident acquired was the Palatine Plaza Shopping Center ("Palatine Plaza"), which Trident bought in 1986 for $8,150,000. (In 1997, Trident sold Palatine Plaza to American National Bank & Trust Co. of Chicago, which intervened as a plaintiff. Because American National's interests are identical to those of the other plaintiffs, however, we do not discuss it separately. We refer to Trident and CAMCO collectively as Trident, for convenience.) Trident invested some $3,000,000 in Palatine Plaza, but as of 1994 it was ready to sell.

Even so, Trident did not actively solicit buyers. Instead, it waited to be courted by them, on the theory that it would get a better price if it did not look too eager. It received a number of unsolicited inquiries from possible buyers. By summer of 1994, eight of these nibbles had become serious enough for the prospective purchasers to execute a Confidentiality and Non-Disclosure Agreement with Trident. Between June and August 1994, Trident received three unsolicited letters of intent to purchase Palatine Plaza. One of those letters was from real estate investor Alfred Koplin, who (after inspecting the property and its books) sent a letter of intent on July 15,

1994, proposing to buy it for a price of $7,750,000. Trident rejected this figure as inadequate and counteroffered $9,350,000. Koplin responded with a letter on August 5, 1994, offering an even $9,000,000 for the property. On August 8, 1994, Trident accepted that offer, Koplin deposited $100,000 in earnest money, and negotiations over a final real estate purchase agreement began. Two other potential buyers, N-H Properties and NORCOR, also submitted letters of intent, but Trident turned them away because it had accepted Koplin's letter.

One of Koplin's first actions was to hire an environmental consulting firm to perform an environmental analysis of the property. The firm, Engineering Science ("ES") reported at the end of August 1994 that Palatine Plaza was contaminated with petroleum products. Koplin asked for and received an extension of the deadline for his in-depth investigation of the property from August 31 to September 30. On September 13, 1994, ES gave Koplin a more extensive written report, in which it reiterated that the soil and groundwater had contaminants exceeding state authorized standards, and it recommended a more extensive investigation. Koplin was not interested. Instead, on September 21, 1994, he wrote to Trident and informed it that he was walking away from the deal because environmental damage had been discovered.

Concerned, Trident then hired its own environmental consultant, Environmental Group Services Ltd. ("EGSL") to analyze the property. In a November report, EGSL confirmed the ES findings of soil contamination and it suggested there was possible groundwater contamination. Trident engaged yet another consulting firm in early 1995, The White Oak Group ("WOG"), which confirmed the earlier findings and opined that the source of the contamination was the Amoco gas station adjacent to the property. In an April 1995 report, WOG reported that thousands of cubic feet of soil were contaminated, that

the groundwater was indeed affected, and that further testing was necessary to pinpoint the "plume" of the contamination. By the end of 1995, WOG had concluded the cost of remediation right then would exceed $400,000 and would probably get worse as time went on.

Just before that report, on the strength of the January 1995 information from WOG, Trident took the precaution of sending Amoco a "Notice of Violation" as required by RCRA. It sent this notice on March 20, 1995, which was the first time Amoco realized that Trident believed Amoco was responsible for environmental damage at Palatine Plaza. Amoco responded on April 4, 1995, with a request to Trident for copies of all of its environmental reports. Trident agreed to furnish them, but only after Amoco sent certain information along to Trident. Amoco sent the information on May 25, 1995, and then on July 19, 1995, Trident gave its reports to Amoco. According to Amoco, it was not at all certain when it received the initial March notice that the contamination emanated from its service station, and it needed further information to check things out.

RCRA permits an injured party to bring a private action 60 days after a notice letter is sent, 42 U.S.C. § 6972(b). Trident waited a bit longer than that, but not much: on July 24, 1995, Trident and CAMCO filed the present action against both Amoco and Menginder Bhambra, the lessee-operator of the station, because it appeared that Amoco was not prepared to take any action. (Amoco had checked its internal records and found that the underground tanks were passing tank tightness tests and that no reports of leaks had ever been filed in the past for that station.) The complaint sought injunctive relief requiring Amoco to clean up the contamination, and it also sought money damages under state trespass, nuisance, and negligence law for the economic impact the contamination had on Trident's ability to sell the property.

Amoco resisted these claims initially, but on October 16, 1996, the parties filed a stipulation with the district court, the operative paragraph of which reads as follows:

Past releases from Defendants underground storage tanks have caused contamination of Plaintiffs' adjoining property. Defendants Amoco Oil Company and Defendant Menginder Bhambra have not complied with the federal underground storage tank regulations 40 C.F.R., Part 280, due to unremediated past releases from their underground storage tanks. As a result, Defendants Amoco and Mr. Bhambra are liable parties under the citizen suit provisions of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as further amended by the Hazardous and Solid Waste Amendments of 1984 ("RCRA"), 42 U.S.C. § 6972.

The remainder of the legal proceedings accordingly focused only on the damages question, not on liability.

## II

At the trial, Trident introduced evidence designed to show that the environmental contamination Amoco's tanks had caused had rendered Palatine Plaza unsaleable at anything but what it called a "vulture price," from August 1994 when the problem was discovered until October 1996 when Amoco stipulated to its liability and buyers were once again reassured that they were not looking at potentially huge remediation costs (or litigation). It introduced testimony indicating that the fair market price of Palatine Plaza before the contamination was discovered was $8,750,000 to $9,000,000; that the property was not marketable after the contamination was discovered without some creditworthy party agreeing to bear the cost of cleanup; that Trident, because it was winding up as a trust, was not such a party; and that Amoco was. It also introduced evidence showing that the environmental

problems lay behind Koplin's decision to walk away from the 1994 deal; that N–H had specifically said that its August 1994 offer was contingent on a clean environmental report; and that NORCOR had no interest in pursuing a purchase if the contamination problems were not resolved.

Trident also introduced evidence indicating that one buyer was willing to pay something like 30–50% of what Trident thought the value of the property really was, and others were suggesting prices from 20 to 40 cents on the dollar. Finally, the jury heard evidence that Highland Management Associates ("Highland") was interested in the property, and that it signed a letter of intent to purchase it just five days after Amoco admitted liability. Highland entered a firm contract two months later, on December 9, 1996, and the sale closed at a price of $6,000,000 in February 1997. The broker representing Highland testified that the deal was contingent on Amoco's stipulation of liability. Yet even the stipulation did not extinguish Highland's uncertainty about what it was buying: despite the fact that 30 months had passed between the discovery of the contamination (and Koplin's withdrawal from the original deal) and the closing of the sale, the precise scope of Amoco's compensatory and other duties remained in doubt. As a result, Highland joined the fray as an intervenor, but settled with Amoco six months later. Thus, its claims are not at issue in this appeal.

Without disagreeing with most of those facts (which in any event were supported by evidence the jury could have believed), Amoco tried to persuade the jury that Trident was just complaining about a decrease in market value of the property caused by events entirely unrelated to the environmental pollution. By the end of June 1995, rumors had begun to circulate in the real estate market that a Tax Increment Financing District ("TIF") was going to be established near Palatine Plaza, and that it would house a new shopping center. Because the TIF would be tax subsidized, rental rates would be lower and the new center would thus have a competitive advantage over older properties like Palatine Plaza. The rumored TIF materialized at the end of 1995, and some time later Deer Grove Shopping Center opened its doors. Palatine Plaza's anchor tenant, a Dominick's grocery store, left Palatine Plaza, moved to Deer Grove, and (adding insult to injury) took advantage of a term in its lease with Palatine Plaza to continue paying rent and thus to leave a large, unattractive, unoccupied shell of a store in the middle of Palatine Plaza. It was these events, Amoco insisted, that caused the market value of Palatine Plaza to drop, not anything about some environmental contamination from the adjacent gas station, which later proved to affect only about 2% of the total property and (at least for now) to cost only $32,972 to bring into compliance with Illinois standards.

When it came time to submit the case to the jury, the judge gave the following instruction on the measure of damages:

You must decide the amount of money, if any, which will reasonably and fairly compensate the Trust [i.e. Trident] for the damages proved to have been suffered by the Trust as a proximate result of the contamination. Whether any damages have been proved by the evidence is for you to determine.

The damages to real property are sometimes determined by the difference between the "fair market value" of the property immediately before the discovery of the damage, and the property's "fair market value" immediately after discovery of the damage. In this case, the Trust claims that Palatine Plaza did not have a fair market value immediately after the contamination was discovered, and that the property did not regain its fair market value until Amoco admitted liability and agreed to clean up the contamination. Amoco disputes this and claims that Palatine Plaza did have a fair market value immediately after the contamination.

If you find that the Trust has not proven its proposition by a preponderance of the evidence, your verdict should be for Amoco, and you should assess no damages.

If you find that the Trust has proven its proposition by a preponderance of the evidence, then the Trust is entitled to that portion of the difference between the fair market value of the real property immediately before the contamination was discovered and its fair market value after Amoco stipulated to liability which was proximately caused by Amoco.

In determining the extent to which Amoco proximately caused this difference in fair market value you can take into consideration the nature, extent, and duration of the injury and also consider the reasonableness of the conduct of both Amoco and the Trust during this time period.

Trident had alleged that Amoco's actions had proximately caused the entire $3,000,-000 reduction in value represented by the difference between the $9,000,000 Koplin had been willing to pay just before the contamination was discovered and the $6,000,000 Highland actually paid after Amoco stipulated to liability. The jury, however, awarded only $1,850,000 in damages, evidently attributing some of the reduction in value to other factors.

In October 1997, Trident moved to add punitive damages to its request for relief, on the theory that Amoco or Bhambra had known of repeated leakages beginning in 1982, that the contamination posed a risk to public safety, and that they had failed to report the leakages as required by law. The district court initially permitted the amendment, but it later granted Amoco's motion to dismiss the punitive damages request, in effect leaving the complaint unamended. Trident has cross-appealed that part of the judgment. Also, on December 18, 1997, Trident dismissed Bhambra from the case without prejudice; we therefore have no occasion to discuss his liability further.

## III

Although Amoco has presented four arguments for reversal, three of them relate to the measure of damages Trident recovered and the way the damages question was explained to the jury in the court's instructions. The fourth focuses on the district court's decision to admit certain evidence that Amoco contends was irrelevant and prejudicial. Trident, as we said, has cross-appealed from the dismissal of the punitive damages request. We look principally at Amoco's damages arguments; the remainder of the points can be disposed of more quickly.

### A.

■ Amoco first argues that Trident's recovery should be limited to the cost of removing the discharged gasoline, rather than any reduction in the market value of Palatine Plaza, because the leak is properly characterized as temporary rather than permanent. See, e.g., *Arras v. Columbia Quarry Co.*, 52 Ill.App.3d 560, 10 Ill.Dec. 192, 367 N.E.2d 580, 583 (1977). We decline, however, to overturn the jury's damage computation on the basis of the characterization of the leaking gasoline as a temporary or permanent injury, for, as the district court noted in denying Amoco's request that the jury be instructed on damages for temporary injuries, "that's why we have a jury in the box." The decision to leave this question to the jury is supported by ample precedent, see, e.g., *Beatty v. WMATA*, 860 F.2d 1117, 1125–26 (D.C.Cir.1988); *Hartzler v. Town of Kalona*, 218 N.W.2d 608, 610 (Iowa 1974). Moreover, the characterization of an injury as temporary or permanent is only a means to a broader end—determining the actual damage incurred. *Statler v. Catalano*, 167 Ill.App.3d 397, 118 Ill.Dec. 283, 521 N.E.2d 565, 571 (1988) (upholding jury award even though distinction between temporary and permanent nuisance was never submitted to the jury). Even Amo-

co seems to focus principally not on the characterization of the injury to Palatine Plaza, but rather on the causal link between its spill and Trident's losses, which we discuss in great detail below.

■ Amoco then claims that the jury's award improperly reimbursed Trident for a "lost sales opportunity," which falls within the general category of unrecoverable consequential damages. However, this misapprehends Trident's claim. Trident does not argue merely that it was damaged because it lost the opportunity to sell to Koplin in 1994. Rather, it asserts (and offered evidence to the jury to demonstrate) that the leaking storage tanks made its property unmarketable as a practical matter, thereby diminishing its market value. Such damages are fully recoverable. See, e.g., *Williams Pipe Line Co. v. Bayer Corp.*, 964 F.Supp. 1300, 1332 (S.D.Iowa 1997) (noting that the reason that damages are not awarded for a lost sale opportunity is precisely because such damages are subsumed by an award for the property's lost market value). Moreover, the instructions to the jury in no way suggested that Trident should receive damages for a lost sale opportunity. Rather, they quite clearly refer to "that portion of the [change in fair market value] which was proximately caused by Amoco."

■ We now turn to Amoco's principal objection to the measure of damages Trident recovered and the way that the district court explained the damage question to the jury. Amoco claims that the jury awarded damages to Trident for losses suffered as a result of the TIF and the departure of Dominick's, rather than the gasoline leak from Amoco's underground tanks. In short, Amoco denies causation. For its claim, Amoco relies heavily on this court's decision in *Movitz v. First National Bank of Chicago*, 148 F.3d 760 (7th Cir.1998), which was decided after the trial but which relies on general damages principles found in Illinois law.

At first glance, *Movitz* does appear unfavorable to Trident, but a closer examination reveals substantial—and legally important—differences between the theory of damages this court rejected in *Movitz* and the theory that supported Trident's verdict. In *Movitz*, a real estate investor relied on a bank's evaluation of a building in Houston in making a decision to purchase the property in 1981. The investor, through an entity he created called Estock, bought the building, but in the end the decision proved to be a bad one. The Houston real estate market collapsed; the building's earnings were woefully short of what had been predicted; and by the time Estock unloaded the building it had lost its entire investment. The investor's trustee in bankruptcy, Movitz, sued the bank, claiming that but for the bank's bad advice at the outset, all of these losses could have been avoided. The jury agreed, but this court reversed. Even though it agreed that "but for" causation existed, that was not enough. First, the loss that occurred had little to nothing to do with the duty the bank had breached. Second, and more important, the court drew an analogy to the concepts of "transaction causation" and "loss causation" that exist in the area of securities law. Even if transaction causation—that is, "but for" causation—was present, the kind of loss that occurred for Estock was not the kind that the bank's duties to investigate and disclose were intended to prevent. Furthermore, the record contained no evidence of what the building would have been worth throughout the relevant period if the bank had acted at all times with the required due care.

Amoco reads *Movitz* broadly as standing for the proposition that losses that occur because of general market conditions are never recoverable. This ignores, however, the court's careful attention to the type of duty that was allegedly breached in *Movitz* and the source of the damages the plaintiff was claiming. In *Movitz*, the plaintiff's basic position was that he never would have bought the property if the bank had

conducted a proper investigation and had fully disclosed the pertinent information. But future fluctuations in the general market price of property in Houston had nothing to do with that initial decision, and this court held that the bank's act of giving advice did not make it an insurer for everything else that might happen in the world after the purchase took place. If, in contrast, the plaintiff in *Movitz* had already owned the property, it had decided to sell it, and the bank had first negligently issued a report claiming that the building was structurally unsound, and then 18 months later had issued a corrective report, we would have something closer to the present case. The loss in value for sale purposes between the dates of the first report and the second report, if loss there is, occurs as a proximate result of the bank's negligent action. The entire goal of the plaintiff in that case is to exit the market. If the defendant's wrongful act impedes exit, and exit can occur only later when prices are lower, then it is theoretically possible that the defendant's wrongful act causes some or all of the loss in value.

That is exactly what took place here. Trident was trying to exit the real estate investment market, or so the jury could have believed. It wanted to sell Palatine Plaza, but Amoco's admitted wrongful act of environmental contamination rendered the property virtually unsaleable. Again, Amoco disputed that fact, but the jury had both versions of events in front of it, and it was entitled to believe Trident's evidence.

The fact that the environmental problem may have turned out to be small and manageable in the end is irrelevant to the kind of risk a buyer might have perceived *ex ante*, when the fact of contamination first became known. The risk of huge liability had the effect of drying up all offers for the property that were anywhere close to the price Trident thought it would fetch after it had been fixed. Trident's hope and confidence that the value would be restored, however, meant little or nothing

to arms' length buyers, who took a "show me" approach to the problem. Yet what might seem like Trident's most straightforward route to a "show me" solution—cleaning up the mess themselves—would not make any business sense, given that they would not then be able to recover under RCRA from the contaminator. See *Avondale Federal Savings Bank v. Amoco Oil Co.*, 170 F.3d 692 (7th Cir.1999), construing RCRA in light of *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (holding that a landowner who begins her own costly cleanup even after initiating a RCRA suit cannot utilize the power of this federal environmental legislation to recover any costs incurred). Thus, Amoco's leaking tanks unavoidably created a substantial risk of enormous liability to any potential purchaser. And this case is about that risk, not about either Trident's belief that a better price was possible for its investors or the final dimensions of the problem and its solution.

It is also important to note that the court's instruction to the jury did not erroneously tell the jury that it should mechanically award the difference between the market price before the contamination was discovered and the price after Amoco admitted liability. Instead, the court was careful to tell the jury to award only "that portion of the difference" that was "proximately caused by Amoco." Expanding on the latter concept, the court also told the jury to consider the reasonableness of the conduct of both Amoco and Trident during the relevant period. The jury thus knew that it should consider whether Trident had done all that it should have to mitigate damages; whether Amoco should have responded more promptly to the report of the contamination; and whether Dominick's departure and the TIF were really to blame for Trident's losses. And in fact, the jury decided that the full $3,000,000 drop in market value was too much, and it cut the recoverable amount by more than a million dollars.

No instructions are perfect, but the rule is that we will not find reversible error in jury instructions if, taken as a whole, they fairly and accurately inform the jury about the law. *Wichmann v. Board of Trustees of Southern Ill. Univ.*, 180 F.3d 791, 804 (7th Cir.1999). Because they correctly limited the damage award to the losses for which Amoco is responsible, the district court's instructions met that test.

### B.

■ Amoco also complains that the district court erred by admitting evidence that was irrelevant and prejudicial. It claims that two general categories of evidence suffered from these flaws: first, evidence of events occurring after the 1994 discovery of the contamination, especially evidence of Palatine Plaza's eventual sale for $6,000,000, Amoco's investigation and decision to defend, Amoco's settlement negotiations, and the timing of Amoco's stipulation of liability; and second, evidence of Amoco's alleged improper past practices concerning environmental issues in other cases unrelated to Palatine Plaza.

Trident responds that Amoco has waived its objections regarding the liability and settlement evidence, both because it failed specifically to object on relevancy or prejudice grounds at the time, and, more importantly, that it was Amoco itself that first brought up the subject of the settlement offers, over Trident's objections. (It did so because the subject of indemnity arose during those discussions, and it wished to refute Trident's claim that the property was utterly unmarketable.) The court admitted the stipulation because of its clear relevance to Trident's damage claim and to Amoco's defense of failure to mitigate. Last, Trident argues that Amoco waived objections on grounds of prejudice to the evidence about contamination at other sites. It claimed only lack of relevance and lack of foundation, both of which objections the district court overruled.

■ We will overturn a district court's evidentiary rulings only when its decision amounts to an abuse of discretion. *Old Chief v. United States*, 519 U.S. 172, 174 n. 1, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *Bradley v. Work*, 154 F.3d 704, 708–09 (7th Cir.1998). We find nothing like that here, since all of the evidence in question was at least arguably relevant to the portion of the decline in Palatine Plaza's value attributable to the risks created by Amoco's leaking tanks. This court's general discussion of evidence of subsequent events in *First National Bank of Kenosha v. United States*, 763 F.2d 891, 894 (7th Cir.1985), is not to the contrary, since this case presents a situation in which subsequent events are relevant. Indeed, Amoco's own principal argument is that Trident's losses are attributable to subsequent events (the creation of the TIF and the departure of Dominick's). Admitting the challenged evidence was therefore appropriate. Because we conclude that there is no substantive basis for overturning the decision to admit the challenged evidence, there is no need to address Trident's waiver arguments.

### C.

■ On cross-appeal, Trident claims that the district court improperly refused to allow it to amend its complaint to add a request for punitive damages. We review this decision too for abuse of discretion. *Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir.1998). Here, the trial court's decision to disallow Trident's claim for punitive damages appears to have been driven by the concern that Amoco would be unfairly prejudiced by the amendment, which was offered only after Amoco stipulated to liability and more than two years after Trident brought its initial suit. Given these circumstances, we find no abuse of discretion in the denial of leave to amend. See *Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc.*, 125 F.3d 468, 480–81 (7th Cir.1997) (affirming the denial of leave to amend because of the possibility that a

punitive damages claim could have changed the defendant's strategy).

We therefore AFFIRM the judgment of the district court on the jury's verdict for the plaintiffs, as well as the court's judgment dismissing plaintiffs' claims for punitive damages. Costs on the appeal will be assessed against Amoco.