In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-2819

ANDREW J. MAXWELL,

*Plaintiff-Appellant,*

*v.*

KPMG LLP,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 3524—**Joan B. Gottschall**, *Judge.*

_____

ARGUED FEBRUARY 27, 2008—DECIDED MARCH 21, 2008

_____

Before EASTERBROOK, *Chief Judge*, and POSNER and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff is the Chapter 7 bankruptcy trustee of a company named marchFIRST. He brought this suit against KPMG, the accounting firm claiming that marchFIRST had been harmed as a result of the accounting firm's breaching its duty of care in violation of Illinois tort law. He seeks more than $600 million in damages. The district judge withdrew the case from the bankruptcy court and ultimately granted summary judgment in the defendant's favor.

KPMG was the auditor of a firm called Whittman-Hart, which offered consulting services in information technology. In the fall of 1999 Whittman-Hart became interested in buying a firm larger than itself called US Web/CKS, which provided consulting services primarily to companies that used the Internet to sell goods or services. The purchase was consummated on March 1, 2000; the date became Whittman-Hart's new name. Whittman-Hart paid the owners of US Web more than $7 billion. It paid entirely in the form of stock, a risky currency; for beginning in the following month many Internet-related ("dot.com") businesses experienced deep, often terminal, reverses. By virtue of the acquisition of US Web, marchFIRST was such a business, and the following April, thirteen months after the acquisition, it declared bankruptcy.

The trustee argues that while the acquisition was being negotiated, KPMG approved a statement of Whittman-Hart's fourth-quarter 1999 earnings that it should have known was false. It should have known, the trustee argues, that Whittman-Hart had engaged in a form of what is called "round-tripping." A company makes a loan to a firm controlled by it, with the understanding that the borrower will purchase services from the lender in an amount equal to the amount of the loan, though the services may never be performed or if performed may have little value and thus cost the lender little or nothing. In effect the loan is reclassified from an account receivable by the lender to operating income to him minus only the zero or nominal cost of the services that he renders or pretends to render the borrower.

The trustee also complains that KPMG should not have approved Whittman-Hart's classifying prepaid consulting fees that it had received in the fourth quarter of 1999 as revenue in that quarter, rather than allocating

them to 2000, when the fees were earned. Cf. *Indiana Lumbermens Mutual Ins. Co. v. Reinsurance Results, Inc.*, 513 F.3d 652, 653-55 (7th Cir. 2008).

As a result of these accounting maneuvers, Whittman-Hart's fourth-quarter 1999 earnings were significantly overstated. We'll assume, without having to decide, that KPMG was negligent in approving the maneuvers that generated the overstatement. Had the earnings been correctly stated, US Web would have learned that they had been considerably lower than Whittman-Hart's third-quarter earnings and its anticipated as opposed to realized fourth-quarter earnings. Therefore, the trustee argues, US Web would have lost interest in being acquired by Whittman-Hart and the acquisition would have fallen through. There is no "therefore." Whittman-Hart was eager to make the acquisition and so might have paid more for US Web to offset, as it were, the poor fourth-quarter results—in which event KPMG's alleged negligence would actually have saved Whittman-Hart's shareholders money had marchFIRST prospered. But we'll accept the trustee's argument, though just to move the analysis along, and also accept his further argument that had the acquisition fallen through, Whittman-Hart, though presumably not US Web, would have survived the travails of the dot.com sector. US Web was larger than Whittman-Hart and more of a dot.com business. It was, the argument goes, only because Whittman-Hart was chained to a drowning US Web by virtue of the acquisition that it too drowned.

An immediate problem, unremarked by the parties, is that the principal beneficiaries should the trustee prevail in this suit would be the former shareholders of US Web, even though there is no claim that US Web

would have survived had it not been acquired. The trustee is asking for damages far in excess—more than $500 million in excess—of the $93.6 million owed marchFIRST's unsecured creditors. The bulk of the recovery would thus go to the shareholders, and US Web's shareholders received 57 percent of the stock of marchFIRST. Yet the linchpin of the trustee's case is that US Web pulled marchFIRST down to its doom. US Web cannot be at once the cause of the bankruptcy and its principal beneficiary.

More important, to say that had it not been for KPMG's negligence the acquisition would have fallen through and Whittman-Hart would have survived, and therefore KPMG was a cause of the debacle, conflates a necessary condition—confusingly called by lawyers a "but-for cause"—with a real "cause," confusingly called by them a "proximate cause" and enigmatically defined as something "that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause." *Cleveland v. Rotman*, 297 F.3d 569, 573 (7th Cir. 2002) (Illinois law). Conventional as these usages are, they are unhelpful.

A necessary condition is a sine qua non, but it is rarely a "cause" in any meaningful sense of the word. No one would say that Whittman-Hart's demise was "caused" by the invention of the Internet, though had it not been invented and enticed US Web, Whittman-Hart would, if the trustee is correct, be fine. Cf. *Movitz v. First National Bank of Chicago*, 148 F.3d 760, 762 (7th Cir. 1998). Among the myriad of necessary conditions for anything to occur, the one designated "the cause" is the one that is significant from the standpoint of the person making the designation. There may of course be more than one such necessary condition, and there was here. There are also cases in

which a condition that is not necessary, but is sufficient, is deemed the cause of an injury, as when two fires join and destroy the plaintiff's property and each one would have destroyed it by itself and so was not a necessary condition; yet each of the firemakers (if negligent) is liable to the plaintiff for having "caused" the injury. *Kingston v. Chicago & N.W. Ry.*, 211 N.W. 913 (Wis. 1927); cf. *Summers v. Tice*, 199 P.2d 1 (Cal. 1948). This is not such a case.

The necessary conditions for Whittman-Hart's demise that are relevant to this appeal were first its decision to buy US Web and second the precipitate decline of the dot.com business. The decision to buy US Web was not influenced by KPMG's approving Whittman-Hart's accounting decisions, and neither, of course, were the dot.com troubles. US Web's agreement to be bought may have been influenced by KPMG's advice to Whittman-Hart, but that is irrelevant because US Web was doomed by the coming collapse of its market and so was not harmed by the advice.

The same conclusions can be reached by a different route, by asking what duty, enforceable by tort law, was assumed by KPMG as Whittman-Hart's auditor. It was the duty to protect creditors of and investors in Whittman-Hart from being misled to their harm by financial statements issued by Whittman-Hart that contained errors that would be material to a creditor or an investor. E.g., 15 U.S.C. § 77k(a)(4); 225 ILCS 450/30.1; *FDIC v. Ernst & Young LLP*, 374 F.3d 579, 580-81 (7th Cir. 2004) (Illinois law). It was not a duty to give the company business advice, such as advice on whether to acquire another company. *Johnson Bank v. George Korbakes & Co.*, 472 F.3d 439, 443 (7th Cir. 2006) (Illinois law); *Fehribach v. Ernst & Young LLP*, 493 F.3d 905, 911-12 (7th Cir. 2007). The knowledge required to give such advice is possessed by the business itself and by business-consulting firms, as

distinct from auditors. The auditors' concern is with the accuracy of the company's books rather than with the demand for the company's products or services or the attractiveness of its investment opportunities. It is true that many accounting firms offer business consulting as well as auditing services and that KPMG is one of them and did some consulting for Whittman-Hart and hoped to continue doing so for marchFIRST. But the suit complains only about KPMG's auditing services, and there is no contention that they were influenced by the firm's consulting wing.

The failure to state Whittman-Hart's fourth-quarter earnings accurately, insofar as it was due to KPMG, may as we said have been a wrong to US Web (though a wrong that did no harm if indeed that firm was doomed), but it was not a wrong to Whittman-Hart, as the auditor neither was asked to nor did advise Whittman-Hart to buy US Web. By swallowing a larger company, and one concentrated in the dot.com business, Whittman-Hart assumed the risk of being injured, fatally as it turned out, by a downturn in that business. It wants to make its auditor the insurer against the folly (as it later turned out) of a business decision (the decision to try to acquire US Web) unrelated to what an auditor is hired to do.

Nothing in Illinois law permits such an attempt to succeed. As we explained in the *Movitz* decision, also a case governed by Illinois law, "The distinction between 'but for' causation and actual legal responsibility for a plaintiff's loss is particularly well developed in securities cases, where it is known as the distinction between 'transaction causation' and 'loss causation.' Suppose an issuer of common stock misrepresents the qualifications or background of its principals, and if it had been truthful the plaintiff would not have bought any of the stock. The

price of the stock then plummets, not because the truth is discovered but because of a collapse of the market for the issuer's product wholly beyond the issuer's control. There is 'transaction causation,' because the plaintiff would not have bought the stock, and so would not have sustained the loss, had the defendant been truthful, but there is no 'loss causation,' because the kind of loss that occurred was not the kind that the disclosure requirement that the defendant violated was intended to prevent. To hold the defendant liable for the loss would produce overdeterrence by making him an insurer against conditions outside his control . . . . Also, it is bad policy to encourage people harmed in some natural or financial disaster to cast about for someone on whom to lay off the consequences who had, however, committed only a technical breach of duty. The legal system is busy enough without shouldering the burden of providing insurance against business risks. Had [the investor] diversified his investments, he would not have taken such a big hit when the Houston real estate market collapsed." 148 F.3d at 763 (citations omitted).

As if this were not bad enough, the evidence that the trustee presented to prove damages was outlandish. The plaintiff's expert, a financial analyst named Paul Marcus, testified that had it not been for the acquisition of US Web, Whittman-Hart would have had a "fair market value" (whatever exactly that means) of $535 million on the day that instead marchFIRST declared bankruptcy. He based this estimate on the market capitalizations that day, compared with what they had been at the time of the acquisition, of companies that he deemed comparable to marchFIRST. But he admitted that before the high-tech stock market bubble burst, movements in the stock prices of those companies were not correlated with each other or with movements in the price of Whittman-Hart's

stock. He suggested no basis for thinking that never-theless they would have been affected the same way by the events that caused the bubble to burst.

In addition, he based his estimate of what Whittman-Hart's stock would have been worth in April 2001 on the average decline in the stock prices of his comparison group of companies without taking account of their capital structures. Yet an external shock will cause a company's stock price to fall farther the more debt the company has. If the value of a company's assets falls by 50 percent, and it has no debt, its stock price (setting aside any other influences on that price besides asset value) will fall by 50 percent. But if the company has 40 percent debt before the shock, its stock price will fall by 83 percent. For, originally worth $1 million, the company now is worth only $500,000 yet owes its creditors $400,000, leaving only $100,000 of value for the share-holders. The original equity value was $600,000 ($1 million minus the $400,000 in debt), and the decline in equity value was $500,000, which is 83 percent of $600,000.

The expert also failed to correct for the fact that although his valuation of what Whittman-Hart would have been worth in April 2001 assumed that US Web would not have been acquired, 57 percent of that value, if awarded as damages, would go to the former shareholders of US Web, contradicting the premise of his analysis that they would never have had an interest in Whittman-Hart. The trustee's lawyer confused matters at argument by stating incorrectly that he was representing only the unsecured creditors of Whittman-Hart. In fact he is repre-senting the entire bankrupt estate of marchFIRST, and, as we know, seeking damages far in excess of the claims of the creditors.

The extreme weakness of the trustee's case, both on liability and on damages, invites consideration of the exercise of litigation judgment by a Chapter 7 trustee. The filing of lawsuits by a going concern is properly inhibited by concern for future relations with suppliers, customers, creditors, and other persons with whom the firm deals (including government) and by the cost of litigation. The trustee of a defunct enterprise does not have the same inhibitions. A related point is that while the management of a going concern has many other duties besides bringing lawsuits, the trustee of a defunct business has little to do besides filing claims that if resisted he may decide to sue to enforce. Judges must therefore be vigilant in policing the litigation judgment exercised by trustees in bankruptcy, and in an appropriate case must give consideration to imposing sanctions for the filing of a frivolous suit. The Bankruptcy Code forbids reimbursing trustees for expenses incurred in actions not "reasonably likely to benefit the debtor's estate," 11 U.S.C. § 330(a)(4)(A)(ii)(I), and authorizes an "appropriate sanction" against parties who file such a claim. Bankruptcy Rule 9011(b)(2), (c)(1)(B); *In re Bryson*, 131 F.3d 601, 603-04 (7th Cir. 1997); *In re Cohoes Industrial Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir. 1991). Not "reasonably likely to benefit the debtor's estate" may well be a correct description of this suit.

We are particularly disturbed by the damages claim. It is not only groundless, as we have seen; it is intimidating, because of its size. Nor is it a good plea that yes, the damages claim of $626 million is preposterous, but suppose that therefore the probability of its succeeding is only 1 in 1000; well, .001 × $626 million is $626,000, and that "expected value" of suing may exceed the cost of the suit to the bankrupt estate. There is something wrong

with this reasoning. For if .001 is too high an estimate, the trustee can up his damages claim to $6.26 billion—the probability of success will be even lower, but even if it is only 1 in 10,000 (and how exactly would one demonstrate that it is less?), the expected value of suing will still be $626,000. A frivolous appeal has *some* chance of success: lightning may strike, or the law may change while the appeal is pending; and a trustee who succeeds in obtaining a judgment will share in it. 11 U.S.C. §§ 326(a), 330.

But frivolous suits are forbidden. So frivolousness must depend not on the net expected value of a suit in relation to the cost of suing, but on the probability of the suit's succeeding. If that probability is very low, the suit is frivolous; really that is all that most courts, including ours, mean by the word. See, e.g., *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 952 (7th Cir. 2006); *Moreland v. Wharton*, 899 F.2d 1168, 1170 (11th Cir. 1990). By that standard, this suit may well be frivolous. We note, therefore, that the defendant can file a motion in the district court for an award of reasonable attorney's fees, *In re Roete*, 936 F.2d 963, 966-67 (7th Cir. 1991) (of course to be paid by the trustee personally, not by the bankrupt estate), and a corresponding motion in this court under Fed. R. App. P. 38. We do not, however, prejudge the outcome of either type of motion.

AFFIRMED.